[Cite as *Stapleton v. Stapleton*, 2022-Ohio-3018.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| KRISSANN STAPLETON, | : | APPEAL NO. C-210329 |
| | | TRIAL NO. DR-1901257 |
| Plaintiff-Appellant, | : | |
| vs. | : | *O P I N I O N.* |
| SCOTT STAPLETON, | : | |
| Defendant-Appellee. | : | |

Appeal From: Hamilton County Court of Common Pleas, Domestic Relations Division

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: August 31, 2022

*Roetzel & Andress, LPA*, *Stephen W. Funk* and *Emily K. Anglewicz*, for Plaintiff-Appellant,

*Barbara J. Howard Co., L.P.A., Barbara J. Howard* and *Rachel H. Myers,* for Defendant-Appellee.

**WINKLER, Judge.**

{¶1}    Plaintiff-appellant Krissann Stapleton appeals a divorce decree entered by the Hamilton County Court of Common Pleas, Domestic Relations Division.  She advances two assignments of error for our review that challenge the trial court's decision on property and spousal support.  For the reasons set forth below, we affirm the trial court's judgment.

## I. Procedural and Factual History

{¶2}    Krissann and defendant-appellee Scott Stapleton married in 1987 and had three children, all of whom are now emancipated.  Over the course of the approximately 34-year marriage, the parties owned and operated three related businesses: Miami Athletic Club, Inc., ("MAC") a fitness center; Fitness Xpress, LLC, ("Fitness Express") a CrossFit gym operated out of MAC; and NTM Enterprises, LLC, ("NTM") a company that owns the real estate where MAC and Fitness Express are located.  We collectively refer to as these entities as the "marital businesses" or the "health club."  The main source of income for the parties during much of the marriage was the operation of the health club that afforded them a "high standard of living."

{¶3}    In 2019, Krissann filed for divorce and sought spousal support. Scott counterclaimed. The trial court issued various temporary orders, including support orders and orders that became necessary for operating the health club due to the parties' antagonistic relationship.

{¶4}    Although the parties agreed that they should be granted a divorce on grounds of incompatibility, they could not agree on an equitable property division or spousal support.  The parties had substantial assets in addition to the health club that the trial court needed to divide and value, such as the marital home in Cincinnati, cars,

a boat and related equipment, bank accounts, insurance policies, and retirement accounts. The parties also had mortgages and loans related to the health club.

{¶5}   During their negotiations to resolve the property issues, the parties contemplated selling the health club.  To inform their decision, they hired business consultant Robert Caro to evaluate and value the health club.  Caro had been involved in the industry for 47 years, and he had valued over 400 health clubs.

{¶6}   The purpose of Caro's study was to determine the fair market value for the combined assets of the real estate (land and building), furniture/fixtures/equipment, and business.  Caro issued a comprehensive 97-page report concerning a valuation date of June 20, 2020, under an income approach. He used a net stabilized income value that took into consideration the health club's financials for the preceding 12 months, along with other relevant data, including the impact of the COVID-19 pandemic, and assigned a capitalization rate of four.  Notably, Caro concluded that the fair market value of the health club after considering liabilities was zero.  And he advised the parties that it was a very bad time to sell, with a "minimal" "likelihood of a near-term viable transaction."

{¶7}   As the divorce case proceeded in the domestic relations court, hearings occurred on seven dates between September 28, 2020, and February 24, 2021.  Part of the extensive evidence presented included Caro's testimony and report.

{¶8}   During Caro's December 15, 2020 testimony, he opined, in accordance with his report, that MAC, Express Fitness, and NTM had to be valued as one "package" due to limitations of the real estate.  Moreover, he maintained the only appropriate approach for valuation was the income approach, and that approach demonstrated there was no net equity in the health club.  Caro indicated that his

3

analysis considered the actual financials of the health club and property-specific issues such as much-needed-but-deferred maintenance. His simplified analysis was that there were "too many liabilities and not enough assets," resulting in "shareholder equity of zero," at best. He added that more recent data on the "real fragility" of the health club industry due to COVID-19 supported an even lower fair market value than he had calculated in his report. He expected approximately one quarter of all fitness clubs to be closed by the end of 2020. Further, he told the court that, "in his view, it would be a long time before a proper third-party sale can occur."

{¶9} Caro additionally said his assessment showed the health club could not afford to pay two owner salaries, and he suggested one party take on running the business. He warned that running the health club would be a "challenge," requiring an owner "who's willing to be on-site, focused, [and] put all their efforts in." Even with those parameters, Caro could not say with confidence that the health club would survive.

{¶10} Although Scott presented Caro as his expert, Krissann stipulated to Caro's qualifications as an expert, told the court she "did not dispute his zero-value conclusion," and did not present a competing expert. Her counsel cross-examined Caro on various aspects of his assumptions and calculations, including his inclusion of a shareholder loan as a long-term liability without knowing the terms and conditions of repayment. Caro later confirmed that nothing brought out during his cross-examination changed his opinions.

{¶11} While Krissann was consistent in her position that the marital businesses should be sold and the net profits, if any, split equally, she was inconsistent in her position with respect to whether the marital businesses had to be sold as a

4

package and the timing for the sale. She seemed to agree that an immediate sale of the marital businesses was not economically feasible because it would result in a loss. She testified, however, to having a broker ready to list MAC and Fitness Express, but not NTM, for almost $800,000. She did not support this representation with any documentation or details. She also cited 2018 valuation information for NTM, which was mortgaged for approximately $650,000, but not a valuation reflecting the current market condition. Krissann clearly articulated, however, that no matter when the marital businesses were sold, in the interim she sought equal ownership and decision-making authority, and equal compensation from the money streaming through the health club.

{¶12} Other evidence presented for the trial court's consideration on the issues of property and support showed that for much of the marriage, Krissann was physically present and heavily involved in operating the health club, developing marketable experience in the management and ownership of a successful, modern business. Her role and time commitment diminished significantly when she moved to Florida in May 2018 to reside in a condominium owned by the parties but sold during the divorce proceedings. Krissann maintained responsibility at the health club for items such as payroll, updating social media sites, and swim lessons, responsibilities performed remotely a few hours a week. Despite her physical absence from the health club facility, Krissann continued to draw her full salary from the health club and did not seek employment elsewhere.

{¶13} When Krissann moved to Florida in 2018, Scott was working for the health club and as a travelling representative with a company known as Keiser, selling equipment to gyms and colleges for a commission. Scott's involvement with the health

5

club increased with Krissann's relocation. He became responsible for much of the day-to-day managing of the health club such as paying bills and working with vendors. He indicated that to fulfill his onsite and after-hours responsibilities, he contributed about 80 work hours per week. This took a toll on his Keiser commissions.

{¶14} According to the evidence, the onset of the COVID-19 pandemic in the spring of 2020 caused Scott's Keiser commissions to further shrink and the finances of the health club to suffer. The health club's revenue stream from customers decreased significantly due to the loss of MAC members and additional lost Fitness Express memberships. Scott obtained three loans totaling about $400,000 from the Small Business Association ("SBA") for the health club, including a loan for $124,700 provided through the Paycheck Protection Program ("PPP") that was eligible for forgiveness in the future if certain requirements were met. Scott took the position that MAC, Fitness Express, and NTM lacked equity when all associated liabilities, including the almost $650,000 NTM mortgage, were taken into consideration. Supporting financial records were admitted into evidence.

{¶15} Throughout the financial turmoil, Krissann and Scott continued to receive salaries and large "dividends" from the health club. In 2020, they were cumulatively paid $144,000 in salaries and received $104,599.60 in dividends. Scott explained, however, that this money was not reflective of a healthy revenue stream from customers and was related to a subsidization by loaned funds. Scott's testimony was consistent with Caro's testimony that the health club could not sustain the salaries to both parties.

{¶16} Notwithstanding Caro's gloomy predictions related to the health club industry in general, and his specific evaluation of the parties' health club, Scott

requested the opportunity to wholly own and run the health club. He accepted that his request would require him to take on the outstanding mortgage and loans alone, resulting, in his opinion, in a situation where Krissann would not be deprived of any equity.

{¶17} On the issue of support, Krissann sought lifetime spousal support from Scott to "equalize" the income of the parties. She speculated that establishing a career after the sale of the health club was "unrealistic" due to her age and the COVID-19 pandemic. Conversely, Scott sought the termination of support effective May 2021 with no ongoing obligation.

{¶18} In April 2021, the domestic relations court issued a detailed, 30-page decision on property and spousal support. The court set a de facto marriage termination date of September 31, 2020.

{¶19} With respect to property, the court awarded both parties substantial assets not related to the health club, and the appropriateness of that part of the award is not in dispute. The court treated the health club as a zero-value asset that was awarded to Scott, who was made solely responsible for all health club liabilities.

{¶20} With respect to spousal support, the court determined that an award of spousal support was not appropriate or reasonable based on consideration of the express statutory factors, even though as result of the property division Krissann would no longer derive any income from the health club. In a subsequent entry denying a motion for reconsideration filed by Krissann, the court further elaborated on the rationale supporting the property and spousal-support decision.

7

**{¶21}** On May 21, 2021, the trial court entered the decree of divorce. The decree incorporated the previously issued decision and entry on property and spousal support. This appeal by Krissann ensued.

## II. Analysis

## A. Division of Property

**{¶22}** Krissann's first assignment of error challenges the award of full ownership of the health club, undisputedly marital property, to Scott. She contends that the trial court violated the statutory requirements in R.C. 3105.171 for the division of property and "abused its discretion" when concluding that such a division was equitable.

**{¶23}** Whether the trial court's decision on property conformed to the applicable statutory procedure is an issue of law that this court reviews de novo. *See, e.g., Hornbeck v. Hornbeck*, 2019-Ohio-2035, 136 N.E.3d 966, ¶ 13 (2d Dist.). In divorce proceedings, the domestic relations court is directed to "divide" marital property "equitably between spouses" and in accordance with R.C. 3105.171. R.C. 3105.171.(B). An "equal" division of property is the court's starting point. R.C. 3105.171(C)(1); *Franklin v. Franklin*, 10th Dist. Franklin No. 11AP-713, 2012-Ohio-1814, ¶ 3.

**{¶24}** To carry out its responsibility, the trial court must select a valuation date and determine a value for property found to be a marital asset. *See* R.C. 3105.171(A)(2). Further, in making a division of marital property, the court must consider all relevant factors, including those set forth in R.C. 3105.171(F), and make written findings, in accordance with R.C. 3105.171(G), that support the determination that the marital property has been equitably divided. *See Franklin* at ¶ 4.

8

{¶25} Krissann first contends that the language of R.C. 3105.171(C)(1) providing that "the division of property shall be equal" unless "an equal division of marital property would be inequitable" directs the domestic relations court to split each marital asset in half unless the court finds and explains that such a division would be inequitable. Scott argues Krissann misconstrues the court's responsibility under R.C. 3105.171(C)(1). He takes the position that the domestic relations court is directed to allocate the value of assets between parties, and that a marital business, like a marital car or marital home, need not be literally split in half.

{¶26} We agree with Scott that R.C. 3105.171(C) speaks to the overall division of the value of all assets, not an equal division of each asset. And here, the trial court complied with all the requirements of R.C. 3105.171 when dividing the marital assets, including the health club. The court valued and divided the marital assets, including the health club, which it valued as having "no net equity," and ordered Scott to pay Krissann an additional amount of about $230,000 "to equalize the overall division of property." The court also set forth written findings supporting its conclusion that, based on the relevant factors, the marital property had been divided "relatively equally" and equitably. Krissann's assertion that the trial court failed to comply with the statute when dividing the marital property is not substantiated on this record.

{¶27} Krissann also challenges the way the trial court "exercised its discretion" when dividing the marital businesses. As Krissann's argument recognizes, the way the trial court satisfies its obligation to equitably divide marital property implicates a deferential standard of review. *See Berish v. Berish,* 69 Ohio St.2d 318, 319, 432 N.E.2d 183 (1982); *Thomas v. Thomas*, 171 Ohio App.3d 272, 2007-Ohio-2016, 870 N.E.2d 263, ¶ 5 (1st Dist.); *McKenna v. McKenna*, 1st Dist. Hamilton No. C-180475,

9

2019-Ohio-3807, ¶ 9. This deference affords the domestic relations court the necessary flexibility to fulfill its weighty responsibility resolving the property issues based on the relevant facts and circumstances of each unique case. *See Berish* at 321. An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *See, e.g., AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 553 N.E.2d 597 (1990); *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶28} Factual issues, however, such as those arising in the classification and valuation of property, are reviewed under the distinct sufficiency and weight-of-the-evidence standards. *See McKenna* at ¶ 9-10, cited in *Boolchand v. Boolchand*, 1st Dist. Hamilton Nos. C-200111 and C-200120, 2020-Ohio-6951, ¶ 9.

{¶29} Scott contends that the trial court's decision was not unreasonable, arbitrary, or unconscionable. He asserts the valuation and division of property was based on the evidence presented and the unique circumstances of the case, which involved the unprecedented effects of a pandemic. He emphasizes that Krissann's challenge fails to consider the "snapshot in time" valuation that domestic relations courts are required to compute, and that a revenue stream does not equate to profit. Moreover, he asserts her challenge is not based upon competent contrary evidence of value.

{¶30} Upon our review, we conclude that Krissann has failed to demonstrate the trial court abused its discretion when valuing and effecting the equitable distribution of property. This court does not require the trial court to adopt any particular method of valuation or division of marital property. *See Meeks v. Meeks*, 10th Dist. Franklin No. 05AP-315, 2006-Ohio-642, ¶ 8.

10

**{¶31}** Contrary to Krissann's arguments, the trial court's decision evinces a sound reasoning process. The trial court explained that it valued the businesses comprising the health club as one asset with a net-zero valuation, a finding consistent with the evidence, including Caro's persuasive testimony. The court assigned Scott both the health club assets and liabilities, requiring him to indemnify and hold Krissann harmless on all those liabilities. In practical terms, Krissann was awarded one half of zero, which is zero.

**{¶32}** Krissann emphasizes that the fitness equipment owned by the health club and necessarily awarded to Scott as part of the property division skewed the valuation in Scott's favor. We are not persuaded, however, as the record shows the equipment she values at over $1,000,000 had been almost fully depreciated. Further, Caro testified he considered the equipment in doing his appraisal as a component of fair market value, a valuation he defined at "zero."

**{¶33}** The trial court in its findings also addressed why it disposed of the health club by awarding it to Scott, who advocated for that result and embraced assuming all the related debt. The court explained this disposition was more beneficial to both parties than the less desirable option of selling the health club at a loss, or the worst option of providing each spouse with half of a negative value asset and indefinitely prolonging an acrimonious personal and business relationship until a sale could occur. We note the court's resolution was most consistent with R.C. 3105.171(B), which directs the trial courts in divorce proceedings to "divide" marital property between the parties, as opposed to placing the parties in joint ownership after the marriage has been terminated.

{¶34} Notably, Krissann did not hire another expert after she received Caro's report, did not object to his presence as an expert, and did not present an alternative valuation of the collective marital business assets. Moreover, the parties never presented an "agreement" on the issue for the court's consideration, *see* R.C. 3105.171(F)(8), and there is no evidence that Scott acted deceptively with respect to the disposition of the marital businesses.

{¶35} The domestic relations court is vested with flexibility to exercise its discretion in making an equitable award based on the facts and circumstances of the case. *Berish*, 69 Ohio St.2d at 319, 432 N.E.2d 183. Upon a careful review of the facts and circumstances of this case, we hold the division of property was in accordance with the law and was not unreasonable, arbitrary, or unconscionable.

{¶36} Therefore, we overrule Krissann's first assignment of error.

### B. Spousal Support

{¶37} In her second assignment of error, Krissann challenges the trial court's failure to award her any spousal support. An award of spousal support is governed by R.C. 3105.18, and the ultimate inquiry hinges on whether spousal support is "appropriate and reasonable" under the circumstances. *See* R.C. 3105.18(C).

{¶38} When determining whether spousal support is appropriate and reasonable, the trial court must consider all the following factors:

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

**{¶39}** Krissann advances two main arguments in her challenge to the denial of the requested spousal support. First, she argues the trial court erred by failing to consider all the income that Scott will derive from the marital businesses. Second, she argues the trial court abused its discretion when it denied spousal support because,

she contends, the factors of R.C. 3105.18(C)(1) strongly weighed in her favor. We address these arguments in turn.

{¶40} Among the R.C. 3105.18(C)(1) factors the court must consider are "[t]he income of the parties, from all sources" and "the relative earning abilities of the parties." *See* R.C. 3105.18(C)(1)(a) and (b). Thus, the trial court, when determining the issue of spousal support, was required to consider the income generated by the business interests retained by Scott, and the trial court's failure to do so would constitute error. *See Hutta v. Hutta*, 177 Ohio App.3d 414, 2008-Ohio-3756, 894 N.E.2d 1282, ¶ 34-36 (5th Dist.). Importantly, however, unlike when the trial court considers the imputation of income for child support, the court's objective with respect to determining the income of the parties and the relative earning abilities of the parties is not to ascertain a precise income figure that can be employed in a "worksheet" for calculating support. *See Valentine v. Valentine*, 9th Dist. Medina No. 11CA0088-M, 2012-Ohio-4202, ¶ 4-5. The objective is to determine whether spousal support is reasonable and appropriate considering all the statutory factors. *Id.*

{¶41} Krissann claims the trial court did not appreciate the full extent of income inuring to Scott's benefit as a result of the decision to award 100 percent of the marital businesses to him, and that this affected the court's ability to properly consider the disparity in income between the parties. She asserts the court overlooked that the parties during the marriage received income from the health club in the form of both salaries and dividends that paid personal expenses, and that the income and dividends she previously received would now be going exclusively to Scott.

{¶42} Our review demonstrates that the trial court's decision on spousal support fully considered all of Scott's income as statutorily required. Krissann raised

this same argument in her motion for reconsideration. The trial court rejected Krissann's argument, explaining that when considering the income of the parties with respect to the revenue and profit of the health club it had "recognized the [monetary] benefit each [party] received from the businesses in the form of salaries and dividends for personal expenses." The court further explained that this historical information, and the award of the health club to Scott, had to be considered with "the extensive testimony relating to the market for health club and fitness clubs in general and, more specifically, to the precarious financial state of the parties' businesses."

{¶43} Although Krissann may disagree with the trial court's conclusions with respect to Scott's income, the court's comments sufficiently demonstrate the court took into account all the income that Scott would derive due to his full ownership of the health club, as required by R.C. 3105.18(C)(1).

{¶44} Next we address Krissann's argument that the factors of R.C. 3105.18(C)(1) strongly weighed in her favor, and therefore, the trial court's denial of support amounted to an abuse of discretion. She maintains that lifetime support of $6000 a month was warranted under the facts, especially due to the "great disparity of income" between the parties, "the long duration of the marriage," and the parties' "very high standard of living during the marriage."

{¶45} We begin our review of this argument accepting that a trial court has "broad discretion" in determining whether to award spousal based on the facts and circumstances of each case. *See, e.g., Morrison v. Walter*, 1st Dist. Hamilton No. C-210398, 2022-Ohio-1740, ¶ 3; *Reddy v. Reddy*, 1st Dist. Hamilton Nos. C-140609 and C-140678, 2015-Ohio-3368, ¶ 23-24, citing *Kunkle v. Kunkle*, 51 Ohio St.3d 64, 67,

554 N.E.2d 83 (1990); *Coors v. Maceachen*, 1st Dist. Hamilton No. C-100013, 2010-Ohio-4470, ¶ 13.

**{¶46}** In exercising its discretion in this case, the trial court set forth specific, meaningful findings under each statutory factor, including that both parties were in good health, Krissann was 56 years old, Scott was 61 years old, and the parties had been married for approximately 34 years. The court then explained its decision:

Equity requires the court to consider all of the relevant factors both individually and as a whole. Based on the Court's analysis of the foregoing factors, the Court finds that an award of spousal support is not appropriate or reasonable. Since leaving Ohio for Florida in 201[8], Wife attempted to continue as a decision maker for MAC. The distance appears to have hampered her functionality; she has not been able to participate in the same manner as when she was physically present at the club. However, wife continued to receive a salary. She did not attempt to find any work in Florida to supplement her income. Without MAC, wife is without a current source of income. A lack of current income, however, does not fully portray Wife's financial situation. Wife is leaving the marriage with a significant amount of assets and little to no debt. Wife is poised with substantial work experience and skill. She has a college degree and is well equipped to find comparable employment. Wife's retirement accounts are completely intact, and she no longer has minor children to care for. Husband is taking on all of the related business debt, approximately $1,000,000. Due to the Covid-19 pandemic and Husband's age, his ability to sustain the income of both

16

Wife and himself will be drastically reduced. While Wife may need to seek new employment, the Court feels strongly that Wife will be able to do so successfully. Due to the historical and unprecedented results of COVID to the fitness industry, Husband's income for the next 1-5 years is precarious and unpredictable. Wife's acquired skills, work history, and management experience would suggest that she can gain steady employment that will likely exceed Husband's potential yearly income. After very careful consideration, the Court cannot award spousal support to either party in an attempt to equalize their incomes. Therefore, the Court finds that an award of spousal support would be neither appropriate or reasonable.

**{¶47}** In support of her argument that the court abused its discretion by denying the requested support, Krissann cites *Lepowsky v. Lepowsky*, 7th Dist. Columbiana No. 06CO23, 2007-Ohio-4994. *Lepowsky* involved a "homemaker" spouse who challenged the adequacy of a support award considering there was a significant disparity in social security benefits and income ability after a long-duration marriage involving a high standard of living. *Id.* at ¶ 3 and 67. The appellate court found the spousal support unreasonable and inappropriate in amount and duration considering the facts of the case and set it aside as an abuse of discretion. *Id.* at ¶ 94.

**{¶48}** Scott argues this case is easily distinguishable from *Lepowsky* because the spouse seeking support in that case at the end of a long-duration marriage lacked the skills and education necessary for employment at that time and had not been awarded substantial assets. He contends Krissann had the skills, experience, and

education to obtain appropriate employment and, additionally, she was awarded investable assets of more than $2,168,000.

**{¶49}** We are persuaded by Scott's argument. Although Krissann claims the trial court's treatment of her earning capacity was speculative and flawed, she relies on her conclusory assumption that she did not have viable, marketable skills and that she would be unable to earn income, even if she desired.

**{¶50}** This court recently reviewed a case challenging the denial of spousal support requested by a voluntarily unemployed spouse who surmised that he lacked marketable skills to earn substantial income despite a significant work history. *Morrison*, 1st Dist. Hamilton No. C-210398, 2022-Ohio-1740. In *Morrison*, we noted that the party seeking support has a burden to establish that such support is reasonable and appropriate and cannot rely on conclusory statements. *See Morrison* at ¶ 6 and 8.

**{¶51}** In this case, when discussing the relative earning abilities of the parties, the trial court cited testimony from Krissann and former employees of the health club that demonstrated Krissann's strong skills and employment experience were very valuable. The court concluded that the value of Krissann's employment at the health club was reflected in the salary and dividends she received before the separation, and that her position that she was unable to earn income was untenable and unsubstantiated, as she had not tried to find new employment.

**{¶52}** Like in *Morrison*, Krissann's position on her earning ability is merely based on an assumption and conflicts with the evidence. Thus, we are unable to conclude that the trial court's analysis with respect to her income earning ability was speculative and flawed.

18

{¶53} Finally, citing *Lepowsky* and the cases cited therein, Krissann takes the position "that case law confirms that a marriage that lasts longer than 30 years not only supports an award of spousal support, but often justifies indefinite spousal support to ensure the wife maintains the 'same standard of living' as the husband." *See Lepowsky*, 7th Dist. Columbiana No. 06CO23, 2007-Ohio-4994, at ¶ 44-57. This authority provides limited support for Krissann's position because of the differing facts. In this case, the trial court found that the high standard of living enjoyed during the marriage was no longer feasible, that Scott's future finances were tied to the health club and its financial difficulties, and that Krissann's "acquired skills, work history, and management experience would suggest that she can gain steady employment that will likely exceed [Scott's] potential yearly income."

{¶54} Ultimately, our review demonstrates that the trial court carefully considered the factors set forth in R.C. 3105.18(C)(1). Evidence was presented to substantiate the articulated findings and conclusions of the trial court. Considering the precarious state of the health club, Krissann's strong work history, and the substantial investable assets awarded to Krissann, among other things, we are unable to say the trial court abused its discretion when, after weighing all the factors, it found the requested support was not appropriate or reasonable. Accordingly, the trial court did not abuse its discretion in denying Krissann spousal support and we overrule the second assignment of error.

### III. Conclusion

**{¶55}**  Upon our review of the record, and considering the foregoing analysis, we conclude that Krissann has not demonstrated error in the trial court's decision on property and spousal support.  Accordingly, we affirm the trial court's judgment.

Judgment affirmed.

**BERGERON, P.J.**, and **BOCK, J.**, concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.