[Cite as *Vora v. Vora*, 2026-Ohio-2358.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

MAHENDRA VORA, :

    Appellee and Cross-Appellant, :

vs. :

SANGITA VORA, :

    Appellant and Cross-Appellee. :

:

CASE NOS. CA2024-10-069
             CA2024-11-072

OPINION AND
JUDGMENT ENTRY
6/22/2026

APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
DOMESTIC RELATIONS DIVISION
Case No. 22DR43169

Porter Wright Morris & Arthur, and Terry W. Posey, Jr.; and Mark Edward Stone Attorney, LLC, and Mark E. Stone, for appellee and cross-appellant.

Zachary D. Smith, LLC, and Zachary D. Smith, for appellant and cross-appellee.

# **O P I N I O N**

**BYRNE, P.J.**

{¶ 1} Appellant, Sangita Vora ("Sangita"), appeals from certain decisions of the Warren County Court of Common Pleas, Domestic Relations Division, in her divorce from

Appellee/Cross-Appellant, Mahendra Vora ("Mahendra").[1] Mahendra cross-appeals from the same decisions. For the reasons that follow, we sustain one of Sangita's assignments of error, and we partially sustain one of Mahendra's assignments of error. Otherwise, we affirm the domestic relation court's relevant decisions in full.

## I. Factual and Procedural Background

{¶ 2} Mahendra and Sangita married in India on May 6, 1986. Shortly thereafter, they moved to Michigan, where Mahendra had previously lived and attended school. In 1988, they moved to Cincinnati. Two daughters were born of the marriage: Priyanka in 1989, and Anushree in 1995. Both are now adults.

{¶ 3} During the course of the marriage, Sangita was not employed outside the home but managed the household, including child-rearing. Due in part to Sangita's efforts at home, Mahendra was able to focus his efforts on work and what became an extraordinarily successful entrepreneurial career, developing and selling multiple technology-focused companies.

{¶ 4} Starting from essentially no assets at the beginning of the marriage, the parties now have assets in both the United States and India valued at well over $100 million. The most significant of these assets is the family business, Vora Ventures, LLC. It is a holding company which acquires or develops technology companies with the hope of turning them into profitable businesses and/or acquisition targets.

{¶ 5} In August 2018, problems arose in the marriage. Sangita left the marital home but eventually returned. The parties separated again in April 2019. For two years,

---

1. After this appeal was submitted for merit review, Mahendra moved the court to use specific anonymizing acronyms for the parties, witnesses, and businesses discussed in this appeal. We deny that motion. The parties used full names in their publicly-filed briefs. None of the parties or witnesses are minors or victims of crime. We find no basis under Sup.R. 45(E) for restricting public access to this opinion or publishing this opinion in a manner that would prevent the public from identifying the parties, witnesses, or businesses at issue.

the parties attempted to resolve their issues through mediation but they were unsuccessful. In February 2022, Mahendra filed for divorce.

{¶ 6} Prior to trial, the parties entered into stipulations. Of relevance to this appeal, the parties stipulated that Vora Ventures was valued at $96 million.

{¶ 7} Prior to trial, Mahendra filed a notice, pursuant to Civ.R. 44.1, that he would raise and rely on foreign law with respect to a "Hindu Undivided Family" trust. We will describe this kind of Indian trust, and the specific trust at issue in this case, in more detail below.

## A. The Contested Hearing

{¶ 8} In June 2023, the domestic relations court held a 10-day trial on all contested matters. Numerous witnesses testified and an extraordinary number of exhibits were introduced. The contested matters that are relevant to this appeal were the following:

> (1) whether a series of charitable transfers of shares of Vora Ventures to the parties' daughters were legitimate transfers, and, if not, whether the court should make an unequal division of marital assets to compensate Sangita for the transfer of these shares;
>
> (2) the value of the parties' vacation home in India;
>
> (3) the value of an investment in a plot of vacant land in India; and
>
> (4) whether certain marital assets were placed into Mahendra's Hindu Undivided Family trust, and, if so, whether those assets remained marital property.

We will summarize the facts admitted at trial that are relevant to this appeal.

## 1. AnuPriya

{¶ 9} In 2006, Mahendra purchased a 2.5 acre vacant plot of land in Ahmedabad, Gujarat, India. The plan was to build the family's Indian vacation home on this plot. Planning and discussions lasted two or three years. Construction began in 2014 and was

completed in 2018. The home is massive, with approximately 21,000 square feet on the first and second floors alone. The parties named the home "AnuPriya," a combination of their daughters' names.[2] There is no dispute that AnuPriya was purchased and built entirely with marital funds.

{¶ 10} The parties disagreed about the value of AnuPriya and presented competing expert reports and testimony. Mahendra obtained a valuation from an appraisal firm named "JLL." JLL valued AnuPriya at 1,375,341,000 Indian rupees. Sangita obtained a valuation from another appraisal firm, "Colliers." Colliers valued AnuPriya at 1,848,000,000 Indian rupees. For ease of understanding, the expert valuation opinions differed by about $6 million.[3]

## 2. SGV and the SGV Plot

{¶ 11} The parties also disagreed about the value of another marital asset located in India, consisting of a plot of undeveloped land in Ahmedabad, Gujarat, India. Around 2007 or 2008, Mahendra entered into a joint venture with two business partners. The venture was named "SGV." SGV's only asset is a 16-acre plot of undeveloped land (the "SGV Plot"). At the onset of the venture, Mahendra owned one-third of the shares in SGV. Over time, he sold part of his interest to his partners. He held a 15% share in SGV at the time relevant to this appeal.

{¶ 12} As the SGV Plot was SGV's only holding, the parties presented competing expert testimony and reports concerning the value of the SGV Plot, along with the value of Mahendra's 15% interest in SGV. JLL valued Mahendra's 15% interest at 844,917,900

---

2. Our reference to "AnuPriya" in this opinion is to both the land and the building.

3. This calculation is based on the exchange rate of 82.65 Indian rupees per U.S. Dollar, which as described below, is an exchange rate used in the Colliers report. We use this exchange rate throughout this opinion for consistency and to help readers understand, roughly, the relevant U.S. dollar amounts involved. Of course, the exchange rate fluctuates frequently.

Indian rupees. Colliers valued Mahendra's 15% interest at 1,095,000,000 Indian rupees. Again, for ease of understanding, the competing expert opinions differed by about $3 million.

{¶ 13} Mahendra testified that he owed a debt to his two business partners in SGV for amounts they had spent maintaining the property. He identified an exhibit that indicated that as of April 2023, he owed them 87,472,943 rupees. Mahendra asked that this debt be considered in the overall valuation of his interest in SGV.

### 3. Vora Ventures, LLC

{¶ 14} In 2006, Mahendra formed Vora Ventures. Vora Ventures is a holding company for various technology companies that Mahendra either built from the ground up or acquired. The operation of Vora Ventures was discussed extensively at trial, but for the most part, the companies owned by Vora Ventures would operate in a negative-cash-flow environment for years before they may or may not start producing positive cash flow. Mahendra would often have to obtain bank loans or extend personal loans to these companies to keep them operating. As an example, one of the companies owned by Vora Ventures, which contributed a great portion to its paper value, had been operating at a monthly loss of $1.1 million for three years, between 2019 and 2022. The company continued to operate, relying on loans from Vora Ventures and a $30 million bank loan. Vora Ventures would profit when one of these businesses was sold or started turning a profit.

{¶ 15} Vora Ventures' initial operating agreement provided that Mahendra had a 99% controlling interest in Vora Ventures, while Sangita had a 1% interest.

{¶ 16} Beginning in May 2017, Mahendra and Sangita began transferring shares of Vora Ventures to their daughters. Mahendra, Priyanka, and Anushree described this as

an intentional estate planning strategy. The idea was to make tax-advantaged gift transfers of Vora Ventures shares to Priyanka and Anushree at a time when the relative valuation of Vora Ventures was low, and shares could be transferred to the children without exceeding the then $5 million estate and gift tax limitation. Mahendra, Priyanka, and Anushree testified that the family, including Sangita, had numerous and extensive discussions about making these transfers, starting in 2016.

{¶ 17} Between May of 2017 and January of 2019, the parties signed revised operating agreements that ultimately resulted in Mahendra holding 51% of the shares of Vora Ventures, Sangita holding 11% of the shares, and Priyanka and Anushree each holding 19% of the shares. Later, both Priyanka and Anushree assigned their shares to non-marital trusts. Mahendra explained that his was done immediately before Priyanka married for purposes of safeguarding their interests in Vora Ventures, and because pre-nuptial agreements are culturally unacceptable in India.

{¶ 18} Sangita's signature appears on all of the documents effecting these transfers, including the consent documents necessary to assign these Vora Ventures shares to the daughters' trusts. At trial, Sangita did not deny signing these documents. However, she claimed that she essentially had no knowledge of what she was signing, that single-page documents were handed to her and she signed without question. She testified that she was not involved in or consulted in any manner regarding these transfers as they were ongoing. Sangita argued that what occurred here was essentially a scheme by Mahendra to move her marital interest in Vora Ventures outside of the marital estate. She noted that some of these transfers occurred after she had separated from Mahendra.

{¶ 19} Sangita's assertions about her knowledge concerning these Vora Ventures transfers stood in stark contrast to the testimony of the rest of her family. Mahendra,

- 6 -

Priyanka, and Anushree all testified that Sangita was fully aware and actively involved in the estate planning efforts. And when asked if Priyanka was lying about her being present for these family discussions, Sangita would not agree that her daughter was lying, but indicated that "maybe her perception is that I was there, but in reality, I wasn't there."

{¶ 20} Sangita asked the court to award her half of the total value of Vora Ventures ($48 million), rather than half of the 62% owned by her and Mahendra ($29.76 million).

## 4. The Mahendra Vora "HUF" (Hindu Undivided Family)

{¶ 21} A "Hindu Undivided Family," or "HUF," is a legal, taxable entity recognized under Indian law that is similar to an American trust.

{¶ 22} The purpose of a HUF is to place assets in a separate legal entity that can be held for the betterment of lineal descendants. The person who forms the HUF is known as the "Karta." The main beneficiaries of the HUF are called "co-parceners." Co-parceners, are, generally, the lineal (blood) descendants of the Karta, plus the Karta.

{¶ 23} A second class of beneficiary is called a "member." Members are any person who is in the Karta's immediate family but only related by marriage. Members have no vested interest in assets placed in the HUF. In this case, Mahendra is the Karta of the Mahendra Vora HUF ("MV HUF"). Mahendra, Anushree, and Priyanka are co-parceners. And Sangita is a member.

{¶ 24} Mahendra testified that he formed the MV HUF shortly after his marriage to Sangita and then opened a bank account with an Indian bank, the Bank of Baroda, in the name of the MV HUF.

{¶ 25} Mahendra testified that in 2006, and again in 2015, he signed formal declarations, declaring AnuPriya to be part of the MV HUF.

**{¶ 26}** Finally, Mahendra testified that in the beginning of 2018, he assigned his shares in SGV to the MV HUF.

**B. The Domestic Relations Court's Decisions**

**{¶ 27}** Following the contested hearing, the court issued a series of decisions. The court first issued a partial decision on October 26, 2023. This decision addressed the majority of contested issues but left undecided issues concerning how the parties would handle the payment of the property division (essentially, how Mahendra would pay Sangita her share of the marital property). After briefing on this payment issue, the court then issued a second partial decision on January 8, 2024. After this decision, the parties requested clarification on certain issues, and the court issued a "third and final partial decision" on March 1, 2024.

**{¶ 28}** The court then ordered the parties to submit a proposed final decree of divorce. The parties had issues agreeing to the language in the final divorce decree, and the court eventually had to issue two decisions regarding disputes over language in the final decree. On October 3, 2024, the court issued the final decree of divorce.

**{¶ 29}** We will summarize these decisions as they relate to the issues on appeal.

**1. First Partial Decision, Dated October 26, 2023**

**a. Value of the Marital Portion of Vora Ventures**

**{¶ 30}** In its first partial decision, the domestic relations court noted that based on the charitable transfers of Vora Ventures shares to the daughters, Mahendra and Sangita collectively owned 62% of Vora Ventures. The court further noted that Mahendra agreed that this was a marital asset and subject to an equal division, leaving Mahendra and Sangita with $29.76 million each (based on the $96 million valuation). The court further noted that Sangita was arguing that the court should disregard the charitable transfers to

the daughters, based on her allegedly being kept in the dark about those transfers. Sangita based her argument in equity, seeking an award for her half of the total value of Vora Ventures—that is, $48 million.[4]

{¶ 31} The court declined to disregard the charitable transfers to the daughters. The court noted Mahendra's argument that Sangita's own financial expert, after reviewing "countless documents," found that Mahendra never committed any act of financial misconduct. The court further found that Vora Ventures' operating agreement and its several revisions, which had effected the transfers, had not been challenged in any court. The court found that absent a successful challenge to the corporate structure of Vora Ventures, "the Court is convinced that its current setup is the way the parties wanted it to be, and therefore should not be changed." The court noted that the outcome may have been different if the transfers had resulted in the daughters owning all or a vast majority of Vora Ventures shares, leaving Sangita with only a small amount, or if Sangita had transferred her interest in Vora Ventures in return for another asset that did not have a comparable value.

{¶ 32} Accordingly, the court found that the marital portion of Vora Ventures was valued at $59,520,000, making Sangita's share $29,760,000.

**b. The MV HUF and Whether Assets Were Transferred to the MV HUF**

{¶ 33} The court summarized the expert testimony it received from both parties on the nature of, the creation of, and the means of transferring assets to a HUF. The court also noted Mahendra's testimony about the steps he took to create the MV HUF and his efforts to transfer property to the MV HUF, including AnuPriya and his SGV shares.

---

4. Sangita was not seeking to unwind these transactions. She asked the court to equitably grant her this amount in the overall property division.

{¶ 34} Initially, the court addressed whether Mahendra had properly created the MV HUF. It found that he had. The court next addressed whether assets Mahendra claimed were HUF property were in fact transferred to the MV HUF.

{¶ 35} With regard to AnuPriya, the court noted competing expert testimony concerning whether Mahendra's two declarations were sufficient to transfer a legal interest in AnuPriya to the MV HUF, notwithstanding the fact that title to AnuPriya remained solely in Mahendra's name up to the time of trial. Ultimately, the court resolved that AnuPriya was not properly transferred to the MV HUF and found that it was a marital asset subject to an equal division.

{¶ 36} With regard to the SGV Plot, the court noted that Mahendra testified and introduced exhibits that he had transferred his SGV shares to the MV HUF in April 2018. The court found that Sangita "did not contradict" Mahendra's claims that the SGV shares were properly transferred to the MV HUF. Accordingly, the court found that the SGV shares were in the MV HUF. The court then stated that the SGV shares were marital property, subject to an equal division.

{¶ 37} With regard to the Bank of Baroda account, the court made no findings as to whether the account was in the MV HUF. Instead, the court found that the account was marital, and subject to an equal division.

### c. The Contested Values of AnuPriya and the SGV Plot

### i. AnuPriya

{¶ 38} The court summarized the testimony of the competing expert reports and testimony concerning the value of AnuPriya. The court found that the value of AnuPriya was that suggested by Mahendra's expert: 1,375,341,000 rupees.

**ii. SGV Plot**

{¶ 39} The court again summarized the competing expert opinions as to the value of the SGV Plot. Ultimately, the court again sided with Mahendra's expert and found that the value of Mahendra's 15% share of SGV was 844,917,900 rupees. The court also noted that this value would have to be reduced by 87,473,943 rupees because of Mahendra's debt owed to his partners.

**d. Spousal Support**

{¶ 40} The court discussed Sangita's request for spousal support, in which she noted that Mahendra earned a salary of $500,000 from Vora Ventures and that his income should be equalized with Sangita, which would result in a monthly spousal support payment of $20,833. The court noted that Mahendra argued that Sangita should receive no spousal support, due to the fact that she would be receiving significant assets in the overall division of property.

{¶ 41} The court considered all factors set forth in R.C. 3105.18 (the spousal support statute), including the income of the parties, the relative earning abilities of the parties, the duration of the marriage, the contribution of each party to the education, training, and earning ability of the other party, and the standard of living. After having considered all these factors, the court awarded Sangita monthly spousal support in the amount of $10,000.

{¶ 42} The court continued the matter for a hearing and arguments as to how Mahendra would pay Sangita her share of the overall property division, for assets in both the United States and India.

**2. Second Partial Decision, Dated January 8, 2024**

{¶ 43} In the second partial decision, the domestic relations court noted that Mahendra owed Sangita $18,311,054 for assets in the United States. Mahendra asked to pay Sangita this amount over the course of 10 years, with $1.8 million paid yearly. Mahendra further suggested that no interest should accrue on this debt for the first seven years of the repayment plan.

{¶ 44} Mahendra presented several arguments for why no interest should accrue during this time: (1) it would incentivize him to pay the total debt in the first seven years; (2) most of the companies owned by Vora Ventures operated at a negative cash flow and he would need liquidity to keep the Vora Ventures companies operating; (3) Mahendra would have to generate significant pre-tax income to pay the annual $1.8 million payment; and (4) Sangita would have access to $8.7 million in marital assets immediately following the divorce.

{¶ 45} Mahendra also offered that if any Vora Ventures company was sold during the term of the repayment plan, Sangita would receive 50% of the net, post-sale proceeds, up to a maximum of $10 million in one year, which if done, would satisfy the $1.8 million obligation for that year.

{¶ 46} The court noted that Sangita argued that Mahendra's payment plan was "wholly inequitable" for many reasons. She noted that Mahendra did not offer interest-free loans to the companies in Vora Ventures to which he lent personal monies and that allowing him an interest free loan would permit him to freely invest monies owed to Sangita and further enrich himself during the repayment period. Sangita asked that the court impose interest at 10% per annum on the amounts owed under the payment plan.

{¶ 47} Ultimately, the court ordered the payment plan suggested by Mahendra, with $1.8 million due per year and no interest on the amount owed for the first seven years. The court ordered 5% interest on any unpaid balance after that first seven years. The court cited the reasons set forth in Mahendra's memorandum as the basis for this no-interest period.

{¶ 48} The court further ordered that Mahendra was restrained from selling, giving away, or otherwise transferring his interest in Vora Ventures until such time as Sangita was paid her share of the property division in full.

### 3. Third Partial Decision, Dated March 1, 2024

{¶ 49} In a third partial decision, the court addressed various questions posed for clarification or reconsideration in the first two partial decisions. Those issues are not relevant to the appeal. However, at the end of this third partial decision, the court ordered Mahendra's attorney to prepare the final decree of divorce, which would incorporate the decisions set forth in the three partial decisions.

### 4. Disputes over Final Decree of Divorce

{¶ 50} The parties could not agree on the language in the final decree of divorce and raised the disputed issues with the domestic relations court, which led to additional briefing and two hearings. The court then issued two decisions regarding these disputes.

{¶ 51} Of relevance, Sangita raised issues concerning the valuation date of certain accounts the parties held with Goldman Sachs. Sangita also raised issues regarding whether the parties had agreed to certain language regarding the use of a U.S.-dollar-to-Indian-rupee conversion formula. The court issued rulings on both of these issues that will be discussed in more detail below.

{¶ 52} Finally, on October 3, 2024, the domestic relations court issued the entry and final decree and judgment of divorce, which is now the subject of this appeal.

{¶ 53} Sangita appealed, raising five assignments of error. Mahendra cross-appealed, raising two assignments of error.

## II. Law and Analysis

## A. The Division of Marital Property

{¶ 54} Sangita's first assignment of error states:

THE TRIAL COURT ERRED IN ITS DIVISION OF MARITAL PROPERTY.

{¶ 55} Sangita presents two issues for review in support of her first assignment of error. As presented in Sangita's brief, those issues are: "Whether the trial court failed to make an equitable division of property based on [Mahendra's] dissipation of significant marital assets" and "Whether the trial court failed to make a finding regarding [Mahendra's] financial misconduct."

{¶ 56} The gist of Sangita's argument is that she presented evidence that Mahendra engaged in financial misconduct by orchestrating a series of transfers of Vora Ventures outside of the marital estate by gifting shares of Vora Ventures to the couple's daughters without her consent or knowledge. She alleges that Mahendra presented self-serving testimony that these transfers began in 2017, *prior* to when Sangita first left the marital residence. But Sangita asserts that the first documentary evidence that these transfers actually occurred was in gift tax returns executed in October 2018, *after* she had left the marital residence in August 2018. Sangita argues that the transfers were "undertaken as an act of divorce planning after the parties separated in 2018." In other words, Sangita is suggesting that Mahendra undertook an effort to create a record of undated documents that would make it appear like the parties began planning and making

charitable transfers of Vora Ventures to the daughters prior to any signs of trouble in the marriage. Sangita suggests that all these transfers occurred after Mahendra realized that the marriage was likely ending.

{¶ 57} Sangita argues that the domestic relations courts made no specific factual findings regarding Mahendra's alleged financial misconduct and erred by instead simply finding that the court lacked jurisdiction to alter the corporate structure of Vora Ventures as set forth in the operating agreements.

**1. Applicable Law**

{¶ 58} Property division in a divorce case is a two-step process. *Roetting v. Roetting*, 2015-Ohio-2461, ¶ 17 (12th Dist.). First, the trial court must classify the property by determining what constitutes marital property and what constitutes separate property. *Id.*; R.C. 3105.171(B). Second, after classifying the property as separate or marital, the trial court must disburse a spouse's separate property to that spouse and divide the marital property equally between the spouses. *Id.* at ¶ 18; R.C. 3105.171 (C) and (D). However, if the trial court finds that an equal division would be inequitable, then the court must divide the property in a manner it determines is equitable. *Id.*; R.C. 3105.171(C)(1).

{¶ 59} In determining whether an equal division of marital assets would be inequitable, "'a court may consider whether one party has engaged in financial misconduct.'" *Grow v. Grow*, 2012-Ohio-1680, ¶ 103 (12th Dist.), quoting *Smith v. Emery-Smith*, 2010-Ohio-5302 at ¶ 50 (11th Dist.). R.C. 3105.171(E)(3) provides that "if a spouse has engaged in financial misconduct, including but not limited to the dissipation, destruction, concealment, or fraudulent disposition of assets, the court may compensate the offended spouse with a distributive award or with a greater award of marital property.

The burden of proving financial misconduct is on the complaining party." *Emery-Smith* at *id.*

{¶ 60} To facilitate meaningful appellate review of the trial court's division of marital property, R.C. 3105.171(G) requires the trial court to "make written findings of fact that support the determination that the marital property has been equitably divided . . ." *Roetting* at ¶ 19. These findings are especially important where the division results in an unequal distribution of property. *Id.* The requirements of R.C. 3105.171(G) are satisfied when the trial court indicates the basis for its determinations in sufficient detail to enable the reviewing court to ascertain whether the property division is fair, equitable, and in accordance with the law. *Id.*, citing *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 97 (1988).

**2. Standard of Review**

{¶ 61} This court reviews findings that property is marital or separate or that a party has engaged in financial misconduct pursuant to the manifest-weight-of-the-evidence standard. *Renz v. Renz*, 2011-Ohio-1634, ¶ 46 (12th Dist.); *Zollar v. Zollar*, 2009-Ohio-1008, ¶ 10 (12th Dist.). Such findings will be upheld if supported by competent and credible evidence. *Kochaliyev v. Kochaliyeva*, 2025-Ohio-1140, ¶ 24 (12th Dist.). In undertaking the manifest-weight-of-the-evidence analysis, an appellate court weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact "clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115 (9th Dist.2001).

{¶ 62} But we review the trial court's decision to make or not make a distributive award to compensate for financial misconduct under an abuse of discretion standard.

*Robinson v. Robinson*, 2013-Ohio-4435, ¶ 15 (12th Dist.), citing *Mikhail v. Mikhail*, 2005-Ohio-322, ¶ 25 (6th Dist.). Additionally, the trial court is given broad discretion in fashioning a property division and will not be reversed absent an abuse of that discretion. *Roberts v. Roberts*, 2013-Ohio-1733, ¶ 34 (12th Dist.).

### 3. Analysis

**{¶ 63}** We have reviewed the extensive record in this case and find that the domestic relations court's decision to equitably divide Mahendra and Sangita's 62% interest in Vora Ventures was supported by competent and credible evidence. Furthermore, we do not find any abuse of discretion in the failure of the court to make an unequal division of assets based on the charitable transfers of 19% interests of Vora Ventures, respectively, to both Priyanka and Anushree.

**{¶ 64}** Before we discuss the evidence, we note that Sangita argues that the domestic relations court failed to make factual findings regarding Mahendra's alleged financial misconduct. It is true that the court never expressed an explicit finding on financial misconduct. But the court did specifically note Mahendra's argument in the first partial decision that Sangita's own financial expert "found that after careful review of countless documents and financial transactions, Husband never committed any act of financial misconduct." Sangita has not presented any argument on appeal suggesting that this argument lacked merit.

**{¶ 65}** In assessing Sangita's equitable claim for half the value of Vora Ventures, the court observed that the parties had presented evidence by way of legal experts (two attorneys specializing in corporate work, and a law professor), who offered differing views on whether the transfers were properly executed through the three modifications to the Vora Ventures operating agreements.

- 17 -

{¶ 66} The domestic relations court made no specific findings regarding the import of this testimony but stated that Sangita had not challenged the corporate structure of Vora Ventures in a court of competent jurisdiction. The court seemed to imply that the legal propriety of making the transfers through revisions to the operating agreement was a less important issue in terms of deciding how the marital estate should be divided because, as the court found, the "current setup is the way the parties wanted it to be." This statement is an implicit rejection of Sangita's argument that the transfers of Vora Ventures were an act of financial misconduct by Mahendra.

{¶ 67} We conclude that competent and credible evidence supports the domestic relations court's conclusion that the ownership structure of Vora Ventures is what was intended by the parties. Mahendra testified that there were discussions between he and Sangita about how to transfer wealth to their daughters in the most tax efficient manner as early as 2001. He explained that every year he and Sangita tried to give gifts to the daughters up to the federal exclusion amount because it was free of taxes. According to Mahendra, this gifting was important to Sangita, and it was a "pet peeve" of hers if he forgot and she had to remind him to do it.

{¶ 68} Mahendra, Priyanka, and Anushree testified concerning planning and discussions between all four family members concerning the charitable transfers of Vora Ventures from the parents to the children. They testified that these discussions began in 2016 and were connected to uncertainty about the upcoming presidential election. All three testified that the family was concerned that, based on who won the election, there may be a reduction or elimination of the approximate $5 million lifetime estate and gift tax exemption in effect at the time.

{¶ 69} Mahendra testified that at the time of these initial discussions, the valuation of Vora Ventures was relatively low. The company was not "exactly blossoming." So, the family perceived this was a good time to transfer shares of Vora Ventures to the daughters. In order to do this, Mahendra commissioned a company to issue a formal valuation of Vora Ventures, at an estimated cost of approximately $15,000 to $30,000. That work resulted in Vora Ventures being valued at approximately $15 million. At that valuation, a transfer of 15% of Vora Ventures would total approximately $2.25 million, well under the lifetime exemption amount.

{¶ 70} The first transfer to achieve these goals occurred in May 2017 and was documented through a revised Vora Ventures operating agreement, signed by both Mahendra and Sangita. Mahendra transferred 29% of his interest in Vora Ventures to Sangita, resulting in Mahendra owning 70% of Vora Ventures and Sangita owning 30%. Then, each parent gifted 7.5% shares to each daughter. This resulted in each daughter owning 15% shares, Mahendra owning 55%, and Sangita owning 15%.

{¶ 71} Mahendra testified that after the first transfer, he and Sangita had additional conversations about transferring more shares to the daughters. They discussed the percentages, and what would be the correct amount. Mahendra explained that whatever they decided, he would need to retain majority ownership over Vora Ventures because any lender would need to know that Mahendra had authority to obtain loans on behalf of the business.

{¶ 72} Mahendra testified that when the estate and gift tax limitation was expanded during the first Trump administration, he and Sangita decided that they could gift the daughters an additional interest in Vora Ventures and they decided at the time to give each daughter an additional 2%, from Sangita's share. And then at the beginning of 2019

they gave each daughter one more gift of an additional 2% share, from Mahendra's share. Ultimately, both daughters received a total of 19% shares in Vora Ventures.

{¶ 73} Mahendra explained that the reason shares were gifted from Mahendra to Sangita first, and then from Sangita to the daughters, was for tax efficiency purposes, so each parent could exhaust their estate and gift tax limitation.

{¶ 74} Mahendra, Priyanka, and Anushree all testified that Sangita was involved and an active participant in the planning around these charitable transfers. Priyanka described having numerous conversations with her mother about these transfers and recalled how happy everyone was that these transfers were occurring. She noted the only negative emotion from Sangita was irritation that they had not transferred the interests earlier. Mahendra testified that Sangita signed all the documents effecting these transfers and never refused or pushed back at the time.

{¶ 75} Additional evidence admitted at trial corroborated Sangita's awareness of the transactions. This included Vora Ventures K-1s issued to each family member for their use in filing taxes from 2017 forward, all of which reflected the gifts. In addition, Sangita signed all the necessary consent documents required to authorize her daughters to transfer their shares of Vora Ventures to their individual trusts.

{¶ 76} Sangita points to one item of evidence to suggest that these transactions did not occur during the time frame stated and were instead fabricated at a later date. In an email dated February 18, 2018, Vora Ventures' Chief Financial Officer, Mike Jones, requested Sangita and Mahendra, as owners of Vora Ventures, to sign a bank document required for a lending transaction. Sangita suggests that this is proof that only she and Mahendra were owners of Vora Ventures at the time. That is, she suggests that this email shows that the purported first transfer of shares, in 2017, had not occurred. But Jones

testified that he did not agree that there were only two owners of Vora Ventures at the time of this email. He did not know why the bank had requested only two signatures. In his testimony, Mahendra suggested that the lender might have been relying on the parties' 2016 tax return. In any event, Jones further corroborated that these transactions occurred because the gifts in 2017 and 2019 required him to facilitate two separate formal valuations of Vora Ventures (one as of December 31, 2016 and the other as of December 31, 2018), and which were required to comply with the gift tax law. He testified that the valuations cost a combined $20,000.

{¶ 77} In sum, the evidence presented at the contested hearing, including testimony by Mahendra, Priyanka, and Anushree, demonstrated a logical, understandable, tax-conscious plan between family members to protect and transfer wealth from parents to their only children.

{¶ 78} The basis for Sangita's claim that Mahendra committed financial misconduct is her assertion, five to six years after the transfers occurred, that, essentially, her family kept her in the dark concerning these transfers and that she had no knowledge of signing numerous documents effecting these transfers. Sangita claimed that Mahendra would simply give her a document to sign and she would sign it without asking what it was or asking for a copy of the complete document. Sangita also claimed that she was a poor reader.

{¶ 79} Sangita admitted that she was in the home when these conversations occurred but that her family excluded her from these discussions because they did not believe she was "worthy" of being involved. She claimed that most of her time was spent running back and forth from the kitchen, serving her family.

{¶ 80} Sangita's credibility was at play here, and her claim to effectively be an outcast in her family was directly challenged by the testimony of Mahendra, Priyanka, and Anushree, who described her as being an intelligent, hardworking, strong, and capable person. We generally defer to the domestic relations court's credibility determinations. *Lykins v. Lykins*, 2023-Ohio-4469, ¶ 46 (12th Dist.). In its decision here, the domestic relations court, perhaps diplomatically, did not state outright that it found Sangita's testimony incredible. Nonetheless, the court's conclusion that the "current setup is the way the parties wanted it to be" is an implicit finding that Sangita's version of events was not believable. Competent and credible evidence supports that conclusion.

{¶ 81} The evidence does not support the conclusion that Mahendra's actions were a scheme to divert marital funds in anticipation of a divorce filing that would not occur for several years. Instead, the evidence presented demonstrated a well-thought out plan to protect the financial interests of adult children and pass wealth to those children in a tax-advantaged matter. This was not a matter that was easy to accomplish or expense-free. The evidence was that formal valuations had to occur for the gifts, at considerable effort and expense. There is nothing unusual about what occurred here, especially in a family with such resources. The planning resulted in Mahendra and Sangita both retaining control of Vora Ventures, and marital assets worth tens of millions of dollars, all while setting up and protecting the financial interests of their daughters. This was not financial misconduct, or some conspiracy to deprive Sangita of marital assets, but rather, conscientious financial planning by a wealthy family.

{¶ 82} Sangita cites *Salameh v. Salameh*, 2019-Ohio-5390 (5th Dist.), for the proposition that a wife's voluntary signature on a document does not preclude a finding of financial misconduct. However, the facts of that case are much different than what

occurred here. There, the husband was found to have engaged in financial misconduct after he transferred the marital home to his sister for no consideration, which only benefited his sister and had no benefit to the husband and wife. *Id*. at ¶ 71. The court found that the husband chose to benefit his sister financially, while interfering with his wife's ownership interest in the home. *Id*. *Salameh* does not establish that jointly transferring wealth from parents to children, as occurred here, constitutes financial misconduct.[5]

{¶ 83} Based on the foregoing analysis, we find no abuse of discretion in the court's decision to reject Sangita's request for an inequitable division of Vora Ventures based on claims of financial misconduct. And we find that competent, credible evidence supported the court's factual findings. We overrule Sangita's first assignment of error.

## B. Valuation of Marital Assets

{¶ 84} Sangita's second assignment of error states:

THE TRIAL COURT ERRED IN VALUING MARITAL ASSETS.

{¶ 85} Sangita argues that the trial court erred in its valuation of the SGV Plot and Anupriya. The domestic relations court, in both instances, utilized the valuation opinion of Mahendra's expert, Girish K.S. of the firm JLL.

### 1. Applicable Law and Standard of Review

{¶ 86} Prior to making an equitable division of marital property, a trial court must determine the value of marital assets. *Flynn v. Flynn*, 2011-Ohio-4714, ¶ 10 (12th Dist.). "'Rigid rules to determine value cannot be established, as equity depends on the totality of the circumstances.'" *Id*., quoting *Baker v. Baker*, 83 Ohio App.3d 700, 702 (9th

---

5. We note Sangita's testimony at trial was that the idea of transferring wealth to her children was something she also intended. But she claimed that she wanted to make these gifts herself.

Dist.1992), citing *Briganti v. Briganti*, 9 Ohio St.3d 220, 221-222 (1984). A trial court has broad discretion in determining the value of marital property, and its decision regarding property valuation will not be disturbed on appeal absent an abuse of discretion. *Id*.

**{¶ 87}** "However, in determining the value of marital property, the trial court must have sufficient evidence to justify and support the figure that it establishes." *Id.*, citing *McCoy v. McCoy*, 91 Ohio App.3d 570, 575 (8th Dist.1993). Therefore, whatever valuation the trial court chooses must be supported by competent, credible evidence. *Id.* When valuing a marital asset, the trial court is neither required to use a particular valuation method nor precluded from using any method. *Ruble v. Ruble*, 2011-Ohio-3350, ¶ 64 (12th Dist.). The value assigned to each marital property is established through documentary exhibits and the testimony of the parties and expert witnesses. *See Wei v. Shen*, 2003-Ohio-6253, ¶ 19 (12th Dist.).

## 2. Valuation of the SGV Plot

**{¶ 88}** Sangita argues that the JLL opinion as to the SGV Plot did not consider the highest and best use of the land and therefore the opinion did not present the court with competent and credible evidence of the value of the land. Sangita cites case law for the proposition that a domestic relations court must value property at its highest and best use. We first turn to the evidence submitted at trial.

### a. Evidence Regarding the SGV Plot

**{¶ 89}** The record reflects that the SGV Plot is a 16.08 acre parcel of flat, contiguous, vacant land located in South Bopal, Ahmedabad, Gujarat, India. South Bopal is known for its rapid urbanization and development. The plot is well-connected to other parts of the city through its location on a major road. The plot has excellent visibility and

road frontage. The plot is zoned as "R1." An R1 designation allows mixed-use development, i.e., residential and commercial development.

**b. The Colliers Report and Ajay Sharma's Testimony**

{¶ 90} Sangita's valuation firm, Colliers, used a "comparable approach" methodology to value the SGV Plot. That is, Colliers based its valuation using other comparable properties. Colliers' two comparable properties were sized between approximately 2.5 and 2.9 acres. Both properties were zoned R3, which only allows for residential construction.

{¶ 91} Colliers adjusted the price of these comparable properties for various factors, including location, size, and most notably, floor space index ("FSI"), which we will discuss in greater detail below. In total, Colliers adjusted the per-acre price of both comparable properties upwards by 60%. This adjustment was greatly influenced by the FSI factor, which alone accounted for a 70% upward adjustment in price. Ultimately, Colliers valued the SGV Plot at 7,301,000,000 rupees (approximately $88.3 million) and Mahendra's 15% interest at 1,095,000,000 rupees (approximately $13.25 million).

{¶ 92} Ajay Sharma, Colliers' employee and Sangita's expert witness, testified that Colliers applied a higher FSI in a portion of the SGV land because that area was "eligible" for a higher FSI. Regarding why Colliers chose R3 zoned properties as comparables, Sharma explained that Colliers was not able to find comparable R1 or R2 zoned properties (both of which allow for mixed-use development) near the SGV Plot. On cross-examination, Sharma conceded that the Colliers' valuation presumed a premium FSI in the SGV Plot, that to obtain such an FSI would require the payment of money to the Indian government, and that Colliers had not deducted those costs from its valuation.

**c. The JLL Report and Girish K.S.'s Testimony**

{¶ 93} Mahendra's valuation firm, JLL, also used the "comparable approach" methodology for valuing the SGV Plot. JLL found two comparable properties in the area, one at nearly 4 acres and one at 2.2 acres. The comparables were both zoned R2.

{¶ 94} JLL applied negative and positive adjustments to its comparables to account for differences in size, zoning, road frontage, and accessibility. One comparable property ultimately had no adjustment and the other was adjusted upwards by 15%. Based on these adjustments, JLL concluded that pricing per acre for the SGV Plot was 350,295,000 rupees. This placed the total value of the land at 5,632,726,000 rupees (approximately $68.2 million). JLL therefore estimated Mahendra's 15% interest in SGV at 844,917,900 rupees (approximately $10.2 million).

{¶ 95} Girish K.S., JLL's employee and Mahendra's expert witness, testified that his firm did not use highest and best use in valuing the SGV Plot, but instead the analysis was on "average case basis" which he explained considered the location, zoning, and potential of the property.

{¶ 96} Girish noted that the SGV Plot was zoned R1, which allows both residential and commercial development *and* has access to a main road. The two comparable properties that JLL used for the valuation were zoned R2. R2 zoning also allows residential and commercial development but is not located along a main road. JLL adjusted its comparables' pricing upward by 5% to account for the more premium R1 zoning of the SGV Plot.

{¶ 97} Girish was critical of the Colliers report. First, Girish observed that Colliers' comparable properties were all zoned R3, which only allows residential developments. Girish did not believe that Colliers had made any adjustment for this zoning discrepancy.

Second, Girish noted that the two comparables Colliers used had a FSI of 1.2. As described in the testimony, FSI relates to the population density with which an owner can build on land. Higher FSI presumably results in the ability to place larger, more densely populated habitations on the land.

{¶ 98} Girish noted that Colliers made a 70% upward adjustment to the comparable pricing based on a maximum permissible FSI of 4 in the SGV Plot, which the SGV Plot did not currently hold. Girish testified that JLL's valuation had not considered FSI at all because FSI has to be purchased from the government and raising FSI could also restrict the property in terms of what could be built. According to Girish, potential FSI was not considered by JLL because it would not affect what the market would be willing to pay for the land.

### d. Analysis

{¶ 99} Upon our review of the evidence, we find that competent and credible evidence supported the domestic relations court's decision to rely on the JLL opinion over the Collier's opinion. The court could find that JLL's opinion was more credible based on the use of comparable properties with more similar zoning to the SGV Plot's zoning. The court might also have found JLL's opinion more credible because Colliers included a 70% upward adjustment to its comparables for a premium FSI that the SGV Plot did not currently possess and also did not deduct costs associated with obtaining that premium FSI. In sum, there were rational reasons to conclude that the JLL report presented a more accurate estimation of the SGV Plot's value.

{¶ 100} Sangita argues that the trial court should have nonetheless chosen the Colliers report because it applied the "highest and best use" methodology rather than the "average case basis" methodology employed by JLL. However, as we have already said,

a domestic relations court is neither required to use a particular valuation method nor precluded from using any method. *Ruble*, 2011-Ohio-3350, at ¶ 64 (12th Dist.).

{¶ 101} Sangita cites two Ohio Supreme Court cases in support of her position that the domestic relations court was required to use the highest and best use methodology: *Sowers v. Schaeffer*, 155 Ohio St. 454, 458 (1951), and *Columbus City Schools Bd. of Edn. v. Franklin Cty. Bd. of Revision*, 2017-Ohio-2734, ¶ 20. However, while both these cases describe highest and best use as a method of determining the value of real estate, neither case involved a property valuation in a divorce proceeding under R.C. 3105.171. *Schaeffer* involved estimating the value of property in an appropriation proceeding. *Id*. at 458. *Columbus City Schools* involved the valuation of a property for tax purposes. We do not find that these cases require a domestic relations court to only consider the highest-and-best-use methodology in determining the value of marital real estate. Regardless, the highest-and-best-use methodology employed by Colliers (assuming a premium FSI) was of questionable reliability for the reasons already stated.

{¶ 102} Finally, Sangita asserts that the court abused its discretion by adjusting the value of the SGV Plot downward by 87,472,943 rupees (approximately $1 million). This adjustment was requested by Mahendra during trial. Mahendra testified that when the land was purchased by himself and his partners, the area was very rural and undeveloped. He said that his partners had improved the property by filling "huge" ditches and there were a lot of expenses to make the land presentable to be sold. He testified that his partners had spent "a lot" of money on "land infrastructure." During this testimony, Mahendra identified an exhibit which listed the "infrastructure debt" referred to in his testimony at 47 million rupees as of March 31, 2015. This document also presented the accrued interest on the debt, and indicated a balance owed of 87,472,943 rupees as of

April 24, 2023. Mahendra asked the court to consider this as a debt that would need to be repaid in conjunction with valuing his interest in the SGV Plot.

{¶ 103} Sangita argues that it was error for the court to adjust the value of Mahendra's interest in the SGV land based on this evidence because it was based solely on his claim that the debt existed and there was no other documentary or other evidence corroborating the existence of this debt.

{¶ 104} Sangita cites no law for the proposition that a domestic relations court must have corroborating evidence before it to prove the existence of marital debt. If the court found Mahendra credible as to the existence of the debt, then his testimony would serve as competent and credible evidence demonstrating the existence of the debt. Sangita has not pointed to any evidence admitted at trial that would call into question the existence of this debt. Regardless, the concept that maintaining or building up a 16-acre site of vacant land would require spending "a lot" of money by Mahendra's business partners is not surprising. We therefore perceive no abuse of discretion in the trial court accepting Mahendra's testimony as proof of the existence of this debt related to the SGV land. We find no error with respect to the court's valuation of the SGV land.

### 3. Valuation of AnuPriya

{¶ 105} Sangita next challenges the domestic relations court's acceptance of the JLL report and Mahendra's expert witness' testimony in the valuation of AnuPriya.

{¶ 106} The JLL report and the Colliers report valued AnuPriya using the same methodology. The reports first used comparable properties to value the underlying 2.4 acres of land. Then each report attempted to value the building based on the "replacement cost" approach. In this method, the evaluators attempted to estimate the cost to construct AnuPriya, less depreciation.

{¶ 107} We will summarize the reports and then discuss the expert testimony.

**a. The JLL Report on Anupriya (Mahendra's Report)**

{¶ 108} As to land value, the JLL report used two local properties as comparators. One property was approximately 1 acre and zoned for agricultural use. The second property was approximately 1.45 acres and had the same residential zoning as AnuPriya. JLL applied certain negative adjustments to both properties to account for variations in certain aspects of the properties. Ultimately, the JLL report estimated the value of the land at AnuPriya at 1,282,974,000 rupees (approximately $15.5 million).

{¶ 109} As to the building at AnuPriya, JLL estimated replacement costs for the building at 4,500 rupees per square foot. The report stated that the per square foot replacement costs were based on "ball-park unit estimates available in-house based [on] our experience in executing similar building[s]." The replacement costs included site grading, internal pathways, water and power connection, water sump, landscaped areas, and boundary walls. Replacement costs also considered expenses required for feasibility and site design, project management costs, and marketing expenses. JLL applied this 4,500 rupee-per-square-foot cost to the "built-up area" of the premises, which it stated was 21,963 square feet.

{¶ 110} Less depreciation for the 4 year old home, JLL valued the building at AnuPriya 92,367,000 rupees (approximately $1,117,568). In total, JLL valued the land and building at 1,374,341,000 rupees (or approximately $16.6 million).

**b. The Colliers Report on AnuPriya (Sangita's Report)**

{¶ 111} As to land value, Colliers found three comparable properties, all of which had the same residential zoning as AnuPriya. The lot sizes were approximately 0.25 acres, 0.2 acres, and 0.2 acres. Colliers applied negative adjustments to these

comparable properties, including a 10% negative adjustment on each property to account for the smaller lot sizes. Ultimately, Colliers valued the land at 1,486,000,000 rupees (approximately $18 million).

{¶ 112} As to the estimated costs of construction, Colliers provided a total construction cost breakdown that included rupee-per-square-foot-costs for excavation and backfilling, shell and core work, blockwork and plaster, waterproofing, finishing works, façade works, mechanical, electrical, plumbing and elevator, consultancy costs, and an 18% goods and sales tax. Totaling these numbers, Colliers estimated that the reconstruction costs for the building would amount to 11,287 rupees per square foot.

{¶ 113} In its report, Colliers asserted that the ground floor and first floor (that is, the first floor and second floor in American parlance) totaled 21,963 square feet. However, Colliers noted that the basement was of "similar" size to the ground (first) floor. Colliers used the ground floor sizing from the building plans (12,969 square feet) for the basement and included that in its construction cost estimate. Thus, Colliers applied its rupee-per-square-foot estimate to the estimated building size of 34,932 square feet.

{¶ 114} Less depreciation, Colliers valued the building at 362,000,000 rupees (approximately $4.4 million). In total, Colliers valued the land and the building at 1,848,000,000 rupees (approximately $22.4 million).

### c. Expert Testimony - Girish K.S. of JLL (Mahendra's Expert)

{¶ 115} Girish K.S. testified that typical construction costs for a structure like AnuPriya would be somewhere "in the area" of 2,000 rupees per square foot. Girish testified that JLL increased this cost to 4,500 rupees per square foot due to the type of flooring used and the below ground area.

{¶ 116}   Girish was critical of two aspects of the Colliers report. With regard to the land, he stated that Colliers had used as comparators substantially smaller-sized plots, which he testified sell at a premium of 40 to 50% over larger plots. Yet, he noted, Colliers had only adjusted the pricing of its comparable plots by 10%. As to Colliers' estimate of more than 11,000 rupees per square foot in construction costs, he believed that Colliers' estimation of costs was high, describing it as "unheard of," and stated he was unaware of how Colliers could arrive at such a figure. As an example, he stated that JLL's developer *sold* luxury apartment buildings in a similar micro market in the range of 7,000 to 8,000 rupees a square foot and that these buildings would not sell in excess of 10,000 rupees a square foot. He stated that in these buildings, "consumption" costs for the build could not exceed 4,500 rupees a square foot to maintain a profit margin.[6]

{¶ 117}   On cross-examination, Girish agreed that the cost to build the shell of the building and to install Italian marble flooring could be 3,000 rupees per square foot alone. He further agreed that the remaining 1,500 rupees were sufficient to complete the building, including façade works, HVAC, the elevator, and the soft costs of constructions (architects, surveyors, consultants, ground-works people, and an 18% goods and sales tax). But Girish stated that the construction costs would not include cabinets and woodworking, or "built-ins."

### d. Expert Testimony - Ajay Sharma of Colliers (Sangita's Expert)

{¶ 118}   Ajay Sharma testified concerning Colliers' valuation of AnuPriya. Sharma was critical of JLL's estimate of 4,500 rupees per square foot in construction costs, stating that the marble flooring, woodworking, and the custom finishing present at the home could

---

6. We presume Ginish meant "construction" costs, rather than "consumption" costs.

not be accounted for in JLL's cost estimate. Sharma stated that in his experience, luxury buildings in Mumbai were being built between 8,500 and 9,500 rupees per square foot.

{¶ 119} On cross-examination, Sharma conceded that the estimate assumed that the flooring through *all* of AnuPriya was Italian marble. (There was some suggestion that Italian marble had only been used in a portion of the building.) Sharma also stated on cross examination that average construction costs in Ahmedabad for a mid-segment, multi-story unit were between 2,800 and 3,000 rupees per square foot.

### e. Sangita's Arguments

{¶ 120} Sangita argues that the trial court erred in accepting the JLL valuation of AnuPriya and challenges both JLL's valuation for the land and for the building.

{¶ 121} As to the land, Sangita states that JLL's comparables were "improperly based on comparables in a different, mixed use market." She offers no other argument with respect to the land other than this statement.

{¶ 122} The main focus of Sangita's argument concerns the building. Sangita argues that JLL's replacement cost of 4,500 cost was "facially unsupportable." She notes that Girish K.S. testified that the shell and marble flooring alone would account for 3,000 rupees per square foot, which would only leave 1,500 rupee per square foot to cover soft costs of construction (planning and permitting), internal structures, façade works and finishings (such as molding and cabinets), HVAC, elevator, and an 18% goods and sales tax. Sangita also argues that nothing in the JLL report accounted for the specialized construction costs required for the building's pool and cinema room. Sangita argues that JLL's valuation could not be supported for a building that took seven years to build and plan, with specialized components, high end finishes, and a stylized façade.

{¶ 123} Sangita compares JLL's estimate on construction costs to the specific and more detailed breakdown on costs offered in the Colliers report. She notes that Colliers considered the costs of the foundation, substructure, and superstructure separately. She also notes that Colliers estimated specialized aspects of the property, like the pool, the finishing and façade works, and outdoor architecture and landscaping.

**f. Analysis**

{¶ 124} As to the land at AnuPriya, Sangita essentially presents no argument other than stating the comparables used by JLL were not sufficiently similar. We find no abuse of discretion in the trial court's decision to accept JLL's valuation of the land. One of the comparables was agricultural land, but this parcel was priced similarly to the other comparable, which was zoned residential. In any event, JLL adjusted the price of the agricultural plot upwards by 5% to account for this discrepancy.

{¶ 125} The court may have found significant that all three of the properties chosen as comparators by Colliers were substantially smaller lots than the 2.4 acre plot at AnuPriya. Girish testified about why these smaller plots were substantially more expensive (more buyers, more demand) and his testimony was rational and credible. Colliers only applied a 10% negative adjustment to account for the smaller lot sizes. Therefore, we find no abuse of discretion in the domestic relations court accepting JLL's estimate for the valuation of the land.

{¶ 126} As to the building at AnuPriya, there was obviously a wide discrepancy between the JLL and Colliers estimates, with Colliers estimating a building valued approximately four times that of JLL's estimate. Part of this discrepancy appears to be based on JLL sizing the building at approximately 21,000 square feet and Colliers sizing the property at approximately 34,000 square feet. Why this discrepancy exists is not

exactly clear from the record. It appears that JLL used the built-up area size that was listed in the official building permit. Colliers' report indicates that it did not have the actual dimensions of the basement area and instead used the ground floor to estimate the size because it found that the basement was of a similar footprint. Regardless, Sangita has not argued on appeal that JLL erred in its estimation of the size of the property.

{¶ 127} The other discrepancy, which *is* argued by Sangita, is the vast difference in the price-per-square foot estimate. The Colliers estimate was far more detailed than JLL's estimate in terms of breaking down costs to reconstruct the property. And the JLL report was somewhat vague in terms of how it arrived at the 4,500 rupee-per-square foot figure. But the court also had evidence before it to discredit the reliability of Colliers' opinion. Girish K.S. testified that in his experience, Colliers' costs figures were "unheard of" and that luxury apartments would *sell* for far less rupees-per-square foot than Colliers' estimate. The Colliers estimate also appeared to conclude that the entire building was finished in the same manner as the upper floors, even though the basement floor included car parking and staff quarters.

{¶ 128} There appear to be questions of reliability in both the JLL and Colliers opinions. The JLL report could be criticized for not having sufficiently considered the below-ground constructions costs, although Girish stated that the basement was considered in the 4,500 per square foot rupee estimate. And the Colliers report could be criticized for inflating construction costs far beyond what the market would pay for a similar luxury residence and including these costs on portions of the building that were not finished to the same level as the main living areas. On that note, both experts agreed that ordinary construction costs would be in the range of 2,000 to 3,000 rupees per square foot. On this record we cannot find that the domestic relations court acted unreasonably,

arbitrarily, or unconscionably in choosing JLL's opinion. There was some competent and credible evidence to support the conclusion that JLL's opinion presented a more credible estimate of reconstruction costs, and that the Colliers report greatly overvalued the property. The domestic relations court may also simply have found Girish a more credible live witness as compared to Sharma. We also note that in terms of the overall value of AnuPriya, the great majority of its value lay in the land. While the experts differed in their estimation of the land value, that difference was not so great a discrepancy as that between the building value. Given this record, we find that the domestic relations court did not abuse its discretion in its findings with respect to the valuation of AnuPriya.

{¶ 129} Accordingly, we overrule Sangita's second assignment of error.

### C. Stipulation Concerning Conversion Rate

{¶ 130} Sangita's third assignment of error states:

THE TRIAL COURT ERRED IN ITS SELECTION OF CONVERSION RATE LANGUAGE.

{¶ 131} Sangita argues that the trial court erred by failing to include certain stipulated language in the divorce degree. Specifically, this language related to a U.S.-dollars-to-Indian-rupees conversion rate proposed by Sangita's expert witness for the payment of Sangita's share of the parties' Indian assets in Indian rupees.

{¶ 132} At trial, Sangita offered the expert testimony of Kyle Garcia, who works as a business appraiser. Garcia offered testimony as to the value of Vora Ventures, which value the parties stipulated in U.S. dollars.

{¶ 133} During Garcia's testimony, he indicated that he was aware that Mahendra had asked to pay a portion of his equalization payment to Sangita in the form of Indian rupees. Garcia then went on to describe his recommendation for how the court should order that payment.

**{¶ 134}** Garcia identified an exhibit, which he created, and which was titled "Illustration of Payment for Sangita's Share of India Assets in Indian Rupees." Garcia explained that the exhibit demonstrated two potential methods of payment. One of these methods would result in Mahendra either underpaying or overpaying his obligation, depending on the current dollars-to-rupees exchange rate.

**{¶ 135}** Garcia proposed that to avoid this overpayment/underpayment issue, the court should "set the obligation for Indian assets in U.S. dollars" and then that obligation "would be converted at the exchange rate as of the payment date." As set forth in Garcia's exhibit, this "proposed formula" was "Future Payment Amount in INR equals US$ Obligation as of 12/31/2021 multiplied by the INR/US$ conversion rate on the Payment Date."

**{¶ 136}** As Garcia was testifying concerning his proposed method, Mahendra's attorney interrupted, stating "I think we can reach a stipulation or at least an understanding that what [Sangita's counsel and Mr. Garcia] are representing is a concern. We'd like to take that as part of our proposal." After a brief discussion, in which Mahendra's counsel explained that he had misunderstood earlier testimony about the exchange rate, Sangita's counsel then confirmed, "*there's an understanding there's going to be a formula that right sizes the payments -- to the exchange rate, but the payment is going to be equivalent of U.S. Dollars owed, but paid in rupees.*" (Empasis added.)

**{¶ 137}** While Sangita's counsel was making this confirming statement, Mahendra's counsel remarked "Absolutely." Mahendra's counsel then stated that he recognized that the exchange rate issue was going to be a potential problem and further stated that he was not trying to "shorten" Mr. Garcia's testimony.

{¶ 138} Sangita's counsel then indicated he would move on to a different subject and went on to ask Garcia about other matters.

{¶ 139} Following the trial, the issue of what language the parties had ultimately agreed to during this exchange was raised in post-trial briefing. Sangita proposed language to reflect the parties' verbal "stipulation," which the court rejected as confusing. Ultimately, the court accepted the language in Mahendra's proposed decree, which stated the following:

> The Court finds counsels reached a verbal stipulation during trial that marital assets and/or real properties initially valued in dollars but were to be paid to Wife in Rupees would be rightsized at the Dollar-to-Rupees exchange rate in effect at the time of said payment.

{¶ 140} Sangita argues that the parties stipulated to "the conversion rate proposed by Mr. Garcia, as reflected in the chart he prepared." She identifies that language as the written formula in the exhibit prepared by Garcia, i.e., "Future Payment Amount in INR equals US$ Obligation as of 12/31/2021 multiplied by the INR/US$ conversion rate on the Payment Date."

{¶ 141} From our review of the record, and specifically the exchange discussed above, it appears that Mahendra's counsel verbally agreed at trial to stipulate to the formula proposed by Garcia. Mahendra's proposed language, which was adopted by the court, appears to be derived from the words spoken by Sangita's counsel when he paraphrased Garcia's formula ("there's an understanding there's going to be a formula that right sizes the payments") to confirm that the parties had an agreement. This paraphrasing does not completely capture Garcia's formula however, and omits important details such as the applicable date for valuing U.S. assets (December 31, 2021).

{¶ 142} Mahendra's counsel agreed to stipulate to Garcia's formula and in effect, shortcut his testimony on the subject. Under these circumstances, we believe that it was error not to use the written Garcia formula as the parties' agreed conversion rate language. Given the importance of this language, it is preferable to use language that was thoughtfully considered, placed in writing, and presented to the court as an exhibit. The conversion rate language as it stands now appears to be an attorney's off-the-cuff paraphrasing.

{¶ 143} For the foregoing reasons, we sustain Sangita's third assignment of error. We modify the divorce decree language on the conversion rate to be that stated in Garcia's exhibit: "Future Payment Amount in INR equals US$ Obligation as of 12/31/2021 multiplied by the INR/US$ conversion rate on the Payment Date."

### D. Interest on Monies Owed in the Equalization of Property

{¶ 144} Sangita's fourth assignment of error states:

> THE TRIAL COURT ERRED IN ITS SELECTION OF TERMS
> FOR THE PROPERTY DIVISION AND EQUALIZATION.

{¶ 145} In this assignment of error, Sangita challenges the domestic relations court's decision to award her no interest during the initial seven years of the property division payment period. Sangita also challenges the interest rate set by the court for the final three years of the repayment period.

{¶ 146} As described previously, Mahendra owed Sangita approximately $18.5 million to equalize the parties' U.S. marital assets. The court ordered minimum yearly payments of $1.8 million, which would result in the balance being paid in around ten years. The court did not require Mahendra to pay interest on the debt for the first seven years, but after seven years, the court ordered Mahendra to pay 5% interest per annum on any remaining balance owed.

## 1. No Interest for First Seven Years

{¶ 147}  First, Sangita contends that the domestic relations court erred in awarding no interest for the first seven years. Her principal argument is that awarding her no interest was inequitable based on evidence that Mahendra and Vora Ventures regularly loaned money to Vora Ventures' subsidiary companies and that all of these obligations were subject to favorable interest rates. Sangita questions why—if Mahendra was able to earn interest on monies he loaned his companies—she should not also earn interest on a debt that Mahendra owes her. She suggests that throughout the repayment period Mahendra can profit by earning interest on money that he should be paying to her, while she earns no interest on a substantial debt.

{¶ 148}  A domestic relations court is not required to charge interest on monetary obligations that arise out of a property division in divorce. *Koegel v. Koegel*, 69 Ohio St.2d 355, 357 (1982). "Obligating a trial judge to affix interest would, 'impose an unnecessary restraint on a trial judge's flexibility to determine what is equitable in a special set of circumstances.'" *Drake v. Drake*, 2002-Ohio-6106, ¶ 26 (12th Dist.), quoting *Koegel* at 357. Thus, the decision to impose interest turns on the circumstances of the case and whether imposition of interest would be equitable or inequitable. *See Koegel* at 357. We thus review the decision to impose or not impose interest for an abuse of discretion. *Hingsbergen v. Kelley*, 2003-Ohio-5714, ¶ 16 (12th Dist.).

{¶ 149}  Upon review, we find no abuse of discretion in the court's decision to award no interest for the first seven years of the repayment term. Much evidence was admitted at the contested hearing concerning the nature of Vora Ventures' business, how many of the companies within Vora Ventures operate for years in a negative cash flow environment, and how those businesses often face liquidity issues as they are being

developed. Those businesses are often in substantial debt and need loans from banks, from other more successful businesses within the Vora Ventures family of companies, or from the Vora family itself. This way of operating Vora Ventures' subsidiaries requires substantial cash to keep those businesses running for long enough that they can be in a position to become profitable or find a buyer.

{¶ 150} The experts who testified to the value of Vora Ventures testified that it was not expected to be cash flow positive for several years. The experts agreed that AssureCare, which was one of the more valuable companies owned by Vora Ventures, had significant negative cash flow and there would be a necessity of continued reinvestment into AssureCare before it turned profitable or had positive cash flow.

{¶ 151} In addition, Mahendra argued that he would need to generate significant pre-tax income just to pay the annual $1.8 million payment to Sangita. The court accepted this argument, and it appears supported by the record given the nature of Vora Ventures and how it operates and grows its subsidiaries. Finally, the court noted that Sangita was already set to receive $8.7 million in assets as a result of the property division.

{¶ 152} In sum, there was a reasonable and equitable basis for not requiring Mahendra to pay interest for the first seven years of the repayment period. Not requiring interest would in fact inure to Sangita's benefit because the more liquidity available to Mahendra during the repayment period, the more likely it would be that any of the subsidiary companies within Vora Ventures could be developed to the point of profitability. Furthermore, the repayment plan provided that if any of these businesses were sold, Mahendra was required to pay Sangita 50% of the net proceeds. The domestic relations court's decision also incentivized Mahendra to pay the obligation in full earlier than the full ten-year repayment period, as interest would start to accrue on any remaining balance

after year seven. The court's decision was reasonable, was tailored to the unique facts and circumstances of the family business, and did not constitute an abuse of discretion. *Drake*, 2002-Ohio-6106, at ¶ 26 (12th Dist.).

{¶ 153} Sangita cites *Balog v. Balog*, 1997 WL 311587, *11 (12th Dist. June 9, 1997), for the proposition that a domestic relations court abuses its discretion in not awarding interest under circumstances similar to this case. In *Balog*, this court held that it was an abuse of discretion to not award a wife interest on what amounted to a $65,000 loan to be repaid over the course of five years. *Id*. We observed that the trial court had not ordered husband to make a lump sum payment and instead allowed him to spread the property division over the course of a number of years and in small, $1,000 payments, and that this would allow him to maintain ownership of his business. *Id*. Sangita argues that what occurred in *Balog* is exactly what occurred here, a scenario where Mahendra was permitted to make "small" payments over time in order to allow him to "maintain ownership" of Vora Ventures.

{¶ 154} But there are some obvious points of distinction. The annual $1.8 million payment owed by Mahendra dwarfs the $12,000 annual payment owed by the husband in *Balog*. Though Mahendra is extremely wealthy, most of this wealth is not liquid and it will take considerable efforts for him to generate sufficient income to make the annual $1.8 million payment. Even small amounts of interest imposed on this amount of debt could result in hundreds of thousands of dollars in additional monies owed. Second, the nature of the business at issue in *Balog* was not discussed in that opinion. But it was the cash-poor nature of Vora Ventures and its subsidiary companies, and the need for that cash to ensure the companies' survival, that were the primary driver in the court's decision to not impose interest for the first seven years. If Mahendra was operating a business that

- 42 -

produced consistent, positive cash flow and profits, then the decision not to award interest might constitute an abuse of discretion. But those are not the facts of this case. *Balog* does not convince us that the domestic relations court's decision in this case, under these facts, was unreasonable, arbitrary, or unconscionable.

## 2. The Interest Rate

{¶ 155} Sangita also argues that the court erred in imposing 5% interest on equalization payments owed after the first seven years of the repayment period. She states that at the time the second partial decision was issued, and at the time the decree was entered in 2024, the statutory interest rate was 8% per annum. Mahendra argues that the statutory interest rate at the time of the October 26, 2023, first partial decision was 5% and cites a document attached to Mahendra's written rebuttal to Sangita's written closing argument.

{¶ 156} R.C. 1343.03 governs statutory interest rates. It provides in relevant part:

> when money becomes due and payable upon any . . . decrees, and orders of any judicial tribunal for the payment of money . . . the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code. . . .

{¶ 157} In *Koegel*, the Ohio Supreme Court declined to address the applicability of R.C. 1343.03 to property divisions. 69 Ohio St.2d at 358. Instead, the court noted that the statute applies to obligations that are "due and payable" and the obligation there, a $9,200 note executed by a wife due and payable in five years, would not become due and payable until the occurrence of a future event. *Id*. at 355, 358.

{¶ 158} This court has held that R.C. 1343.03(A) does not apply to interest on a property division because, while it does involve an order for the payment of money, "such payment does not arise out of tortious conduct, a contract, or a transaction." *Hingsbergen*,

2003-Ohio-5714, at ¶ 19 (12th Dist.). While R.C. 1343.03(A) technically does not apply in domestic relations cases, some courts have suggested it can be useful as a guide to determining an appropriate rate. *Thomas v. Thomas*, 2007-Ohio-2016, ¶ 20 (1st Dist.)

{¶ 159} Assuming that it is useful as a "guide," R.C. 1343.03 cites R.C. 5703.47(A) to determine the specific applicable interest rate:

> "[F]ederal short-term rate" means the rate of the average market yield on outstanding marketable obligations of the United States with remaining periods to maturity of three years or less, as determined under section 1274 of the "Internal Revenue Code of 1986," 100 Stat. 2085, 26 U.S.C.A. 1274, for July of the current year.

{¶ 160} Mahendra attached to his rebuttal to Sangita's closing arguments an October 2022 declaration by the Tax Commissioner of the Ohio Department of Taxation that the interest rate prescribed by R.C. 5703.47 for the calendar year of 2023 was 5%. Sangita points out that this rate increased to 8% in 2024, which was the year the court issued the final divorce decree, and this was thus the appropriate statutory interest rate.

{¶ 161} The trial court's October 26, 2023 partial decision addressed nearly all of the contested issues. The issues related to the repayment plan and interest were all briefed in 2023. We find no abuse of discretion or other error of law in the court choosing to employ the 2023 interest rate under R.C. 5703.47.

{¶ 162} We overrule Sangita's fourth assignment of error.

### E. Valuation Date for Goldman Sachs Accounts

{¶ 163} Sangita's fifth assignment of error states:

> THE TRIAL COURT ERRED IN ITS SELECTION OF A VALUATION DATE FOR THE GOLDMAN SACHS ACCOUNTS.

{¶ 164} In her final assignment of error, Sangita contends that the domestic relations court erred by selecting a date of division for certain Goldman Sachs accounts. Sangita

states that the appropriate date of division for most of the financial accounts divided by the parties was the date of the filing of the complaint for divorce. She claims that the court "unknowingly" or "unintentionally" valued the Goldman Sachs account as of April 30, 2023. She states that the court admitted that this particular date was not a deliberate decision but an "oversight." Mahendra, on the other hand, asserts that he asked for April 30, 2023, to be the date of division in order to account for "impermissible withdrawals" that Sangita made from certain accounts and that the valuation date Sangita requested would have "double counted" Vora Ventures assets.

{¶ 165} Generally, a domestic relations court should apply the same set of dates when evaluating all marital property subject to division and distribution in a divorce proceeding. *Homme v. Homme*, 2010-Ohio-6080, ¶ 62 (12th Dist.). But the circumstances of some cases may require the court to use different dates for different valuation purposes. *Keyser v. Keyser*, 2001 WL 337242, *3 (12th Dist. April 9, 2001). If the alternative dates are inequitable, the trial court may select dates that it considers equitable in determining the value of marital property. *Waligura v. Waligura*, 2023-Ohio-3747, ¶ 30 (12th Dist.) Such a decision is reviewed for an abuse of discretion. *Keyser* at *3.

{¶ 166} The domestic relations court addressed this issue in its decision issued on August 19, 2024, resolving various disputes that the parties were engaged in relative to the preparation of the final judgment entry and decree of divorce. In summary, the court noted that it had heard substantial testimony at trial on the Goldman Sachs accounts and how the parties had used those accounts after they separated. However, the court did not believe that the parties had presented evidence or made argument as to the proper date of division of these accounts until after trial and the court was unaware that this was a

contested issue. The court noted that Sangita's counsel had offered the court a monthly statement to show how "unfair" a division on April 30, 2023 was to her, and that Mahendra's counsel had offered to present his own statements.

{¶ 167} The court indicated that it did not believe that this was information that the court should receive in a hearing devoted only to the language of the divorce decree, and instead, this was an issue that the court should have heard at trial. Ultimately, the court stated that "given the overall circumstances," the court would adopt Mahendra's proposed date for division of the Goldman Sachs accounts: April 30, 2023.

{¶ 168} Upon review, we can discern no abuse of discretion in the trial court's decision to choose April 30, 2023. Neither party properly raised the issue at trial nor presented evidence on the issue.

{¶ 169} We also note that Sangita makes no argument as to why the court should have selected a division date for the Goldman Sachs accounts that were more consistent with other accounts. She does not argue that April 30, 2023, was inequitable or resulted in some prejudice and she cites no evidence in the record that would support that argument. She merely argues that the court's choice was "unintentional" or "arbitrary." Sangita has not demonstrated error, or an abuse of discretion. We overrule Sangita's fifth assignment of error.

## F. Decisions Regarding the MV HUF

{¶ 170} Mahendra's first cross-assignment of error states:

> THE TRIAL COURT ERRED IN ITS DIVISION OF THE HUF ASSETS.

{¶ 171} Mahendra argues that the domestic relations court erred in its findings and decisions concerning the MV HUF. Mahendra claims that the court improperly divided an asset it found to be in the MV HUF and improperly found that certain assets were never

properly transferred to the MV HUF. Mahendra presents four issues for review. Before we address Mahendra's specific issues, we will first describe the evidence submitted to the court concerning the HUF and the nature and operation of HUFs under Indian law.

## 1. Evidence Concerning the HUF

{¶ 172} The court heard expert testimony from two Indian lawyers in the capacity of expert witnesses about the nature and operation of HUFs under Indian law. Attorney Mrunalini Deschmukh testified for Mahendra and attorney Poorvi Rohit Chothani testified for Sangita. The expert testimony was mainly consistent regarding the nature and operation of HUFs under Indian law and we will summarize that information below. But the experts disagreed on several points, and we will touch on those disagreements. The court also heard testimony from Mahendra concerning his creation of the MV HUF.

{¶ 173} A "Hindu Undivided Family," or "HUF," has its origins in uncodified Hindu religious law. Beginning in 1956, HUFs were recognized in codified Indian secular laws, including the Hindu Succession Act and the Income-Tax Act. A HUF, which is akin to a trust under American law, is designed to protect the assets of a Hindu family and is for the benefit and welfare of the family.

{¶ 174} Consistent with the patriarchal nature of Indian society, a HUF can only be formed by a Hindu male, and only after he marries a female. The male who starts the HUF is known as the "Karta" and is responsible for managing the assets of the HUF and is in a fiduciary relationship with the beneficiaries of the HUF.[7]

{¶ 175} There are some formal steps to create a HUF to make it a recognized, distinct legal entity in India. First, a marriage must occur between a male and female. Second, the male must obtain a "PAN" card, which stands for "permanent account

---

7. A female can be a Karta. For example, if the original Karta dies, the eldest daughter would become Karta.

number." This is an identification document for tax purposes and is required so that the HUF will be subject to the Income-Tax Act. The other requirement is that the HUF must be funded in some manner. This can be accomplished simply by opening a bank account in the name of the HUF and depositing a small amount of money. There do not appear to be any requirements for a writing dictating how the HUF will operate.

{¶ 176} There are two classes of beneficiaries of a HUF. First, "co-parceners" include lineal descendants of the Karta. A Karta is also a co-parcener. That is, the Karta and his children constitute the co-parceners. Second, a "member" is one who married into the family by virtue of marriage to a co-parcener.

{¶ 177} Co-parceners, including the Karta, have vested interests in the property in the HUF. Generally, co-parceners all have equal rights to HUF assets. Co-parceners, including the Karta, also have the right to demand a "partition" of the HUF. A "partition" results in the dissolution of the HUF and distribution of the HUFs assets. A partition can be achieved informally, through agreement of the co-parceners. A co-parcener can also petition for a partition through the Indian civil court system. A member cannot request a partition.

{¶ 178} A member does have some limited rights to the HUF property. A member, as long as they remain married to a co-parcener, has the right to be maintained by the HUF. A member also has access to real estate owned by the HUF.

{¶ 179} The experts who testified at trial disagreed on whether a member has any right to a share of the HUF upon a partition. Mahendra's expert testified that in a scenario like this case, with a father and two children, the mother could only have a claim to the father's one-third share, and she would only be entitled to half of that share—that is, a one-sixth share.

{¶ 180}  Sangita's expert, on the other hand, testified that as long as Sangita was married to Mahendra, she would be entitled to a one-quarter share upon a partition. That is, Sangita's expert testified that Sangita would be entitled to the same shares as the co-parceners. But if Sangita divorced Mahendra, she would be entitled to nothing.

**2. Evidence Concerning Placing Assets in the MV HUF**

{¶ 181}  Mahendra testified that after he and Sangita married in May of 1986, he obtained a PAN card for the MV HUF. A copy of the PAN card was introduced as an exhibit. It lists an apparent incorporation date of July 14, 1982, four years before the marriage. Mahendra's birthday is July 14, but in 1962, not 1982. There is no explanation in the record for why the PAN card lists July 14, 1982. Regardless, Mahendra testified that he obtained the PAN card after the marriage. There were exhibits at trial that indicated Mahendra had begun the process of having the Indian government correct the date on the PAN card.

{¶ 182}  Mahendra's next step was to open a bank account with the Bank of Baroda. He identified an account statement from the Bank of Baroda identifying an account ending in 0651, which indicated an opening date of June 6, 1986. This was, consistent with his testimony, shortly after the marriage. After opening the Bank of Baroda account, Mahendra testified that he filed tax returns for the HUF every year afterward, and he produced all tax returns for the MV HUF dating back to 2007/2008.

{¶ 183}  The record is not clear how or from what source Mahendra funded the Bank of Baroda account, although the domestic relations court and Mahendra indicate that it was initially funded by a small deposit. Exhibits were introduced at trial indicating that the account contained 403,447 Indian rupees as of February 2, 2023 (equivalent to several thousand U.S. dollars).

{¶ 184} Mahendra testified that he placed his shares of SGV—which owned the SGV Plot—into the MV HUF. He identified a document indicating an April 2018 transfer of shares in from himself to the MV HUF.

{¶ 185} Mahendra testified that in 2006, after acquiring the land for AnuPriya, he signed a declaration placing the land in the MV HUF. Mahendra identified an exhibit at trial titled "Declaration of Oath." The document discusses his purchase of the land and then states,

> I have sworn this affidavit for a specific purpose to state on oath that the aforesaid land together with a residential bungalow is the property of my common stock in HUF comprising myself, my wife and our daughters. I am holding this property as Karta and Manager of my family members and I do not have any independent as well as personal right, title and interest in the said property.

{¶ 186} The document is signed and dated by Mahendra. The document does not appear to be notarized and there do not appear to be any official stamps or other indicia of government recording or approval on the document.

{¶ 187} In February 2015, after construction had begun on AnuPriya, but before the home was finished, Mahendra testified that he signed a second declaration placing AnuPriya in the MV HUF. This second declaration was admitted at trial and contains essentially the same language as the first declaration, identifying the property as "land together with a residential bungalow." Unlike the 2006 declaration, this document appears to be notarized and bears some official-looking stamps. Nonetheless, it is undisputed that title to AnuPriya was never officially transferred to the MV HUF in the local government office. AnuPriya, as of the trial, remained titled in Mahendra's name.

{¶ 188} Mahendra testified that Sangita was aware that AnuPriya had been placed in the MV HUF. In particular, he recalled that he initially discussed placing the property

into his father's HUF, as a way of repaying his brothers for helping pay for his education. However, Sangita was adamant that AnuPriya was not going to be shared outside of the four immediate family members.

{¶ 189} The Indian law experts disagreed on whether Mahendra effectively transferred AnuPriya to the MV HUF. Mahendra's expert testified that there are no formal requirements for transferring property to a HUF. That expert testified that if one wanted to "formally" dedicate property, it could be accomplished through a mere declaration.

{¶ 190} Sangita's expert testified that a mere declaration of property to a HUF is not sufficient to legally transfer property into the HUF. She noted that neither the 2006 nor the 2015 declarations were filed with the appropriate sub-registrar for property records in India. The property records she reviewed indicated that AnuPriya remained titled in Mahendra's name, individually, even weeks before the trial. Her opinion was that Mahendra's declarations were legally ineffective to transfer AnuPriya to the MV HUF. She also noted that her research had uncovered loan documents issued by HSBC Bank showing that a loan had been taken out by Mahendra, that AnuPriya was used as collateral for the loan, and that Mahendra was listed as the owner of AnuPriya. She noted that she reviewed the MV HUF tax returns from 2007 to 2020, and the first year that AnuPriya was listed on the HUF tax returns was 2020.

### 3. The Court's Decision on the MV HUF

{¶ 191} The domestic relations court recounted the expert testimony described above, both generally about the nature of HUFs in India, and specifically with regard to the MV HUF, whether it was properly created, and whether the assets at issue were properly transferred to it.

{¶ 192} The domestic relations court first stated that after considering the evidence and testimony presented, it found that Mahendra had created the MV HUF in India. It then turned to the question of whether assets were properly transferred to the HUF.

### a. AnuPriya

{¶ 193} With regard to AnuPriya, the domestic relations court found that Mahendra did not follow all proper procedures to place AnuPriya into the HUF. The court noted Sangita's arguments that the 2006 declaration did not bear any government stamps or other indicia verifying its authenticity. The court also noted her argument that the 2006 declaration stated that the property was being transferred into the HUF by the mutual consent of "my wife Sangita Vora and our daughters Priyanka and Anushree." Sangita categorically denied ever consenting to such a transfer. And the court noted that Mahendra admitted that Sangita did not know about the transfer until they began the mediation process upon their separation. As such, the court stated that AnuPriya was marital property that would be divided equally, and was not in the HUF.[8]

{¶ 194} The court stated, in what Mahendra describes as "dicta" that even if the evidence established that Mahendra had placed AnuPriya in the MV HUF, the court would still divide AnuPriya's total value between the two parties, notwithstanding Indian law that would say that Sangita has no economic interest in a properly-funded HUF. The court noted that it had the power to make an unequal division of assets when it determined fair and equitable to do so and had the power to make a distributive award from separate property if fair and equitable. In this regard, the court found that Sangita did not know Mahendra had attempted to transfer the parties' "dream home" to the MV HUF until after

---

8. Sangita agreed that Mahendra would retain AnuPriya in the divorce. The court observed that its decision would therefore not impact the daughters' interest in AnuPriya but would only affect Mahendra's cash-outlay in the property settlement.

the parties separated and entered the mediation process. To the court, this made the transfer of AnuPriya "entirely different" from the transfers of shares in Vora Ventures (previously discussed), which the court found that Sangita was aware of.

### b. SGV Shares

{¶ 195} The domestic relations court noted that Mahendra offered evidence that he transferred his shares in SGV to the MV HUF. A document offered into evidence by Mahendra indicates he transferred 230,400 shares of SGV to the MV HUF on April 1, 2018. Two individuals identified as "directors" of "S.G.V. Infrastructure Private Limited" signed this document. The court found that Sangita did not contradict Mahendra's assertion that these shares were in the MV HUF. Accordingly, the court found that the SGV shares were transferred to the HUF. After analyzing the value of the SGV shares, the court ordered an equal division of the value of the shares.

### c. Bank of Baroda Account

{¶ 196} The court found that the Bank of Baroda account was marital and subject to an equal division. The court did not describe whether the account was in the MV HUF or explain its rationale for finding that the bank account was marital.

### 4. The Interplay Between Ohio Domestic Relations Law and an Indian HUF

{¶ 197} The issue of how a state domestic relations court should approach analyzing marital assets owned in India, which are transferred to a HUF, a legal entity unique to Indian law, is a matter of first impression for this court. It may be a matter of first impression for any court in the United States. We were unable to locate any United States case law even referring to a HUF, and the parties have cited none.

{¶ 198} A reader may have questions concerning what jurisdiction an Ohio court would even have over assets in India. Is such an order enforceable in India? At least one

well-reasoned case we have reviewed indicates that as long as the domestic relations court possesses personal jurisdiction over the parties to a divorce proceeding, an Ohio court, through its equitable powers, may compel a party to act in relation to property located outside the court's territorial jurisdiction. *Groza-Vance v. Vance*, 2005-Ohio-3815, ¶ 18 (10th Dist.) (involving property in a different state, Florida).

**{¶ 199}** During the trial, the domestic relations court commented on some of these issues, noting that it was not certain its orders would have any impact on legal proceedings in India, but also noting that if Mahendra and Sangita were to sign a document stating that the parties would be bound in India by the Ohio state court's decision, such a document might hold weight in India. It is unclear whether the parties adopted the court's suggestion.

**{¶ 200}** In any event, here the domestic relations court seems not to have issued orders directing the disposition of assets *in India* (for example, the court did not order assets to be placed in or removed from the MV HUF in India), but analyzing the ownership of the parties' Indian assets and determining how the value or ownership of those assets should factor into the court's distribution of the parties' marital assets—including a potential inequitable division of assets—in Ohio. And the situation here, complex as it is, is not much different from a scenario where one party to a marriage transfers marital assets to an extra-marital entity or to a third party during the marriage. In these situations, the law is clear that the domestic relations court has the statutory and equitable ability to disregard these transfers. Moreover, the parties have not raised any issue on appeal regarding the domestic relations court's (or our) ability to analyze the ownership or valuation of their assets in India, but instead have based their arguments on the implicit

assumption that the domestic relations court had the ability to make decisions with respect to their assets in India. We proceed accordingly.

**a. Standard of Review and Applicable Law**

{¶ 201} Whether AnuPriya, the SGV shares, and the Bank of Baroda account are marital property is subject to a manifest-weight-of-the-evidence review. *Smith v. Smith*, 2023-Ohio-982, ¶ 28 (12th Dist.) We must affirm if the court's classification is supported by competent and credible evidence. *Id*.

{¶ 202} "Marital property" is defined as "All real and personal property that currently is owned by either or both of the spouses . . . and that was acquired by either or both of the spouses during the marriage . . . ." R.C. 3105.171(A)(3)(a)(i). However, marital property, by definition, includes "[a]ll interest that either or both of the spouses currently has in any real or personal property" and "may include a property interest short of absolute ownership." *Kim v. Kim*, 2020-Ohio-22, ¶ 11 (9th Dist.), citing R.C. 3105.171(A)(3)(a)(ii); *Guagenti v. Guagenti*, 2017-Ohio-2706, ¶ 71 (3d Dist.).

{¶ 203} "An irrevocable trust is an independent third-party entity, and, generally, neither the trust nor the assets held by such a trust are subject to equitable division in a divorce." *Kim* at *id*. But, "[p]roperty paid for with marital funds, but that is held by a third party, including a trust, may be treated as marital property under some circumstances." *Id.*, citing *Goswami v. Goswami*, 2003-Ohio-803, ¶ 61 (7th Dist. 2003); *Baker v. Baker*, 83 Ohio App.3d 700, 703 (9th Dist.1992); *Katz v. Katz*, 2014-Ohio-1255, ¶ 24-25 (10th Dist.); *Vulgamore v. Vulgamore*, 2017-Ohio-4114, ¶ 20-24 (4th Dist.); *Janosek v. Janosek*, 2007-Ohio-68, ¶ 75-76 (8th Dist.).

{¶ 204} The party seeking to have an asset classified as separate property must prove by a preponderance of the evidence that the asset can be traced to separate

property. *Kim* at ¶ 11. When reviewing a trial court's determination regarding the nature of an irrevocable trust in the context of divorce proceedings, a "'case-by-case approach based upon the intent and conduct of the relevant parties with regard to the formation and the operation of the trust'" is the proper approach and consistent with the manifest-weight standard of appellate review. *Id.*, quoting *Guagenti* at ¶ 69.

{¶ 205}   In *Kim*, the court found that life insurance policies held by an irrevocable trust were marital property because the policies were purchased by the husband with marital funds without the wife's knowledge and that the husband retained control over the policies, even though they were held in trust. *Kim* at ¶ 13-14. The court found that to hold otherwise "would allow a spouse to unilaterally, and without the consent or knowledge of the other spouse, move marital money out of the reach of the other spouse by merely placing it in irrevocable trust." *Id*. at ¶ 15.

{¶ 206}   In *Goswami*, the court of appeals analyzed whether property located in India was marital property. The court noted that there was no definitive document in the record that established who held title to the property, but also noted that title alone was not outcome-determinative because property that is paid for with marital funds but is titled or held in the name of a third party may be treated as marital property. 2003-Ohio-803 at ¶ 61 (7th Dist.), citing *Baker v. Baker*, 83 Ohio App.3d 700, 703 (9th Dist.1992). In finding that the property was not marital, the court focused on the lack of evidence that marital funds were used to purchase the property. *Id*. at ¶ 62-66.

**b. Analysis**

{¶ 207}   As a prefatory matter, we note that there is no dispute that AnuPriya and the SGV shares were all acquired during the marriage and with marital funds. The Bank of

Baroda account was funded after the marriage and was presumably funded with marital funds, although the record is unclear.

{¶ 208} Mahendra, as Karta of the MV HUF, retained complete control over MV HUF assets under Indian law. Therefore, to the extent that marital assets were transferred to the MV HUF without Sangita's knowledge or consent, the trial court did not err in classifying these assets as marital and making a distributive award to Sangita to account for the value of these marital assets. *Kim*, 2020-Ohio-22, at ¶ 15 (12th Dist.). We next turn to the specific issues raised in Mahendra's appellate brief.

### i. Issue 1: Division of SGV

{¶ 209} Mahendra argues that the domestic relations court erred by equally dividing the SGV shares in the divorce. As stated previously in this opinion, R.C. 3105.171(G) requires the trial court to "make written findings of fact that support the determination that the marital property has been equitably divided . . . ." *Roetting*, 2015-Ohio-2461, at ¶ 19 (12th Dist.). These findings are particularly important where the division results in an unequal distribution of property. *Id.* The requirements of R.C. 3105.171(G) are satisfied when the trial court indicates the basis for its determinations in sufficient detail to enable the reviewing court to ascertain whether the property division is fair, equitable, and in accordance with the law. *Id.*, citing *Kaechele v. Kaechele*, 35 Ohio St.3d 93, 97 (1988).

{¶ 210} In its decision, the domestic relations court found that both parties agreed, or at least did not dispute, that the SGV shares were placed in the MV HUF. The court also noted that, unlike with AnuPriya, Sangita was aware that the SGV shares were in the MV HUF. The court found that Mahendra's 15% share of SGV was valued at 844,917,900 rupees less a debt of 84,473,943 rupees. The court then stated that it would split this value equally in the division of property.

{¶ 211} However, the expert testimony established that if the SGV shares were transferred to the MV HUF, Mahendra's interest in those shares was diluted by the fact that his daughters, as co-parceners, also have a pecuniary interest in MV HUF property. According to Mahendra's expert, he and his daughters have equal one-third shares in the MV HUF property and Sangita has no interest, other than a marital claim to Mahendra's one-third interest. Thus, Mahendra argues, an equitable division of his one-third interest would result in Sangita being entitled to one-sixth the value of the SGV shares.

{¶ 212} On the other hand, Sangita's expert opined that upon partition, Sangita would have a one-fourth interest in HUF property. The court made no findings regarding either expert's testimony regarding the parties' interest in HUF property upon a partition.

{¶ 213} In light of Priyanka and Anushree's combined interest in the MV HUF, an equal distribution between Mahendra and Sangita of the total value of the SGV shares would result in an unequal distribution of marital assets. That is, the division would be unequal because Sangita would receive 50% of the SGV shares while Mahendra would receive only one third of the remaining 50%--thus, effectively, only around 16.67% of the SGV shares. The domestic relations court had the power to make an unequal division of assets relative to the SGV shares, but to do so required it to make findings of fact to justify that unequal division pursuant to R.C. 3105.171(G).

{¶ 214} Here, there are no such findings. It also appears that the domestic relations court may not have intended to make an unequal division of the SGV shares because it specifically noted that Sangita was aware of the transfer of SGV shares to the MV HUF, unlike AnuPriya.

{¶ 215} From all appearances, the domestic relations court seems to have concluded that an equal division of Mahendra's interest in the SGV shares was

appropriate. However, it also appears that the court failed to consider that Mahendra does not own a 100% interest in the SGV shares because they were placed in the MV HUF.

{¶ 216} As such, we sustain Mahendra's assignment of error with respect to the issue of the division of the SGV shares. We remand to the trial court for further proceedings on this issue. If the court was aware of the dilution of Mahendra's ownership of SGV as a result of its order to equally split the total value of SGV shares, then the court should set forth R.C. 3105.171(G) findings explaining the unequal award. If the court intended to divide the SGV shares such that Mahendra and Sangita would ultimately receive an equal value, then it should issue findings relative to which expert opinion it found more persuasive as to Sangita's interest in the MV HUF property, and divide the asset based on that conclusion.[9]

### ii. Issue 2: The Bank of Baroda Account

{¶ 217} Mahendra argues that the domestic relations court erred in finding that the Bank of Baroda account was a marital asset, subject to an equal division. Mahendra states that the domestic relations court provided no rationale for its conclusion that the Baroda account was marital and offered no explanation for why it did not find that the account was placed in the MV HUF.

{¶ 218} The Bank of Baroda account was created during the marriage. and the presumption is that it was funded with marital property. *Clemons v. Clemons*, 1987 WL 32753, *2 (12th Dist. Dec. 31, 1987). Mahendra did not testify that he used separate funds to fund the account or that it had been opened in the name of the MV HUF. It was Mahendra's burden to prove that the Bank of Baroda account was funded using his

---

9. Civ.R. 44.1(B) governs determinations of foreign law and provides that a court "in determining the law of a foreign country may consider any relevant material or source, including testimony, whether or not submitted by a party. The court's determination shall be treated as a ruling on a question of law . . . ."

separate property. On this record, we do not find that the domestic relations court erred in concluding that the Bank of Baroda account should be equally divided.

### iii. Issue 3: AnuPriya

{¶ 219} Mahendra next argues that the domestic relations court erred in finding that AnuPriya was not in the MV HUF, and is marital property. Mahendra focuses his argument on the court's finding that the property was not properly transferred due to deficiencies in the two declarations and the fact that Mahendra retained title to AnuPriya despite having made these declarations. Mahendra points to Indian case law, cited in a bench memo, which holds that title in the Karta, individually, is the same as title in the HUF, when there is other evidence to support the addition of the property to the HUF.

{¶ 220} There was competent and credible evidence to support the domestic relations court's conclusion that AnuPriya was never properly transferred to the MV HUF. Sangita's expert testified that a declaration is not sufficient to transfer property to a HUF and that a deed must be issued on official government "trans paper," which requires the payment of fees. That deed must be registered with a local government office. Sangita's expert stated that she had reviewed the property records for AnuPriya and that title to AnuPriya was held solely in Mahendra's name, including when she checked only weeks before the trial. Mahendra pointed to no contrary evidence. Instead, Mahendra simply points to his expert's opinion that a declaration is sufficient. That the court sided with Sangita's expert does not establish that the court's finding is against the weight of the evidence. *See Walker v. Ford Motor Co.*, 2014-Ohio-4208, ¶ 53 (8th Dist.) (noting that in a classic case of "battle of the experts," a verdict is not against the manifest weight of the evidence where the factfinder choses to believe one expert over another.). Competent

and credible evidence supported the trial court's conclusion that the property was not properly transferred to the MV HUF and is marital property.

### iv. Issue 4: The Award of Half the Value of AnuPriya

{¶ 221} In his fourth issue, Mahendra makes two arguments about the value of AnuPriya.

{¶ 222} First, Mahendra argues that if AnuPriya is in the MV HUF, then Sangita is only entitled to one-sixth or one-fourth of the value, depending on which expert opinion is found most credible. However, as we have already found that the court did not err in finding that AnuPriya was not in the MV HUF, this argument is moot.

{¶ 223} Mahendra goes on to address the domestic relations court's alternative basis for making an equal award of the AnuPriya's value. As a reminder, and as discussed in ¶ 194 above, after finding that AnuPriya was not effectively transferred to the MV HUF and was marital property, the court alternatively found that even if AnuPriya were effectively placed in the MV HUF, the court would still equally divide its value between the parties because the court has the power to make an unequal division of property when the court finds it is fair and equitable to do so, and that doing so here was fair and equitable because it found Sangita to be unaware of Mahendra's (attempted) transfer of AnuPriya to the MV HUF. Mahendra argues this was not fair or equitable. In doing so, he challenges the court's finding that Mahendra admitted that Sangita was not aware of the MV HUF until the family began mediating, and argues that there is no record support for this finding. He points to his own testimony that transferring AnuPriya to the HUF was discussed in 2006, 2010, and 2014 and that both Priyanka and Anushree provided confirmatory testimony, including a detailed 2018 family discussion concerning the benefits of AnuPriya being in the MV HUF.

{¶ 224} Mahendra's argument on this issue is moot as we have already found that the domestic relations court did not err in finding that he did not effectively transfer AnuPriya to the MV HUF, and the trial court's alternative basis for equally dividing AnuPriya's value is therefore irrelevant and just that—an alternative basis. But even if there were a need to address Mahendra's argument, we do not find any error in the court's finding that Sangita was unaware that Mahendra had attempted to place AnuPriya in the MV HUF until the family started the mediation process. Sangita testified that the first time she learned about the MV HUF was in mediation. She offered a corroborating document, an email to the mediator, that indicated she first learned of the HUF during family mediation in 2019, well after Mahendra began declaring AnuPriya part of the MV HUF. She asserted she was surprised and concerned because she did not understand that placing these items in the HUF would affect her interest in the properties. Sangita admitted that she had an earlier conversation with Mahendra about his idea of giving his brothers an interest in AnuPriya, and that she was opposed to it, but not that he mentioned a HUF to her in these conversations. For his part, Mahendra admitted that at the time he signed the 2015 declaration of AnuPriya to the MV HUF, he could not recall whether or not he informed Sangita that he had prepared the declaration.

{¶ 225} Regardless of whether the trial court was incorrect that Mahendra "admitted" that Sangita did know about the HUF until mediation, the court credited Sangita's testimony that she did not know about and was not informed about the MV HUF and its legal effect in India, and what was purportedly transferred to the MV HUF, until the parties began the mediation process. If the court found Sangita credible on this issue, then there was a competent and credible basis for the court to find that Sangita was unaware of the transfer of this significant marital asset to the MV HUF.

{¶ 226} For the foregoing reasons, we sustain Mahendra's first assignment of error with respect to the award relative to the SGV shares. Otherwise, we overrule the assignment of error and affirm the domestic relation court's decision on all other issues raised.

## G. Spousal Support

{¶ 227} Mahendra's second assignment of error states:

THE TRIAL COURT ERRED IN AWARDING SPOUSAL SUPPORT.

{¶ 228} Mahendra argues that the domestic relations court erred in awarding spousal support while simultaneously finding that both parties had "enormous assets that they will never be able to spend during their lifetimes." Mahendra argues that the court failed to address whether Sangita had any "need" for spousal support and cites case law for the position that where a party leaves a marriage with no debt and ample financial resources, spousal support is inappropriate.

### 1. Applicable Law and Standard of Review

{¶ 229} A trial court may award spousal support to either party in a divorce proceeding after providing an equitable division of the marital property. R.C. 3105.18(B). Pursuant to R.C. 3105.18(C), a trial court must consider multiple factors to determine whether spousal support is appropriate and reasonable. *Rigby v. Rigby*, 2021-Ohio-271, ¶ 23 (12th Dist.). *Accord Gaffney v. Gaffney*, 2020-Ohio-5051, ¶ 10 (12th Dist.) (holding that a trial court has a "statutory duty to base a spousal support order on a careful and full balancing of the factors in R.C. 3105.18[C][1]").

{¶ 230} The trial court has broad discretion in determining whether to award spousal support, the amount of the award, and the duration of the award. *Curry v. Curry*, 2017-Ohio-8127, ¶ 15 (12th Dist.). A reviewing court will not disturb the trial court's decision

absent an abuse of discretion. *Binks v. Binks*, 2019-Ohio-17, ¶ 25 (12th Dist.). An abuse of discretion implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 231} The partial decision issued on October 26, 2023, addressed spousal support. The court addressed every factor set forth in R.C. 3105.18(C)(1). Below, in bold text, we list the statutory factors. In non-emphasized text below each statutory factor, we have quoted the trial court's written findings regarding that factor.

> **The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;**
>
> Husband draws a salary of $500,000.00 per year from Vora Ventures. Meanwhile, Wife is not employed outside the home.
>
> **The relative earning abilities of the parties;**
>
> Wife is intelligent and physically healthy, but - as indicated above - has never worked outside the home. Therefore, the Court finds it would be extremely difficult now for Wife to enter the workforce and earn a significant income. Husband is employed to his maximum potential.
>
> **The ages and the physical, mental, and emotional conditions of the parties;**
>
> Husband is 61 years old and in relatively- good physical, mental, and emotional health. Wife is also 56 years old and is in likewise relatively good physical, mental, and emotional health.
>
> **The retirement benefits of the parties;**
>
> Both have significant retirement benefits.
>
> **The duration of the marriage;**
>
> The parties were married on May 6, 1986. They separated in April of 2019. The Court finds the duration of the marriage to be 33 years.

**The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;**

While Wife was, during the marriage, the primary caregiver of the children, she no longer serves that role. The oldest daughter is now 33 years old and the youngest 27 years old.

**The standard of living of the parties established during the marriage;**

The parties enjoyed the highest standard of living that is imaginable.

**The relative extent of education of the parties;**

Husband earned a bachelor's and master's degree from the University of Michigan, while Wife does not have a post-high school education.

**The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;**

The parties have enormous assets that they will never be able to spend during their lifetimes.

**The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;**

Wife contributed to Husband's master's degree and development of the numerous businesses. As a result, she will rightfully share equally in the division of all marital assets.

**The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;**

The Court has no evidence of Wife's desire or ability to undergo any significant education or training to obtain a position.

**The tax consequences, for each party, of an award of spousal support;**

Because of the Tax Act of 2017, spousal support is no longer included in a recipient's gross income and, accordingly, is no longer a deduction for the payor.

**The lost income production capacity of either party that resulted from that party's marital responsibilities;**

Wife had caregiving responsibilities for the girls many years ago when they were in school. However, throughout the marriage, she was expected to take care of all matters relative to the family household, which is why - as indicated above - she will rightfully equally share in the division of all marital assets.

**Any other factor that the court expressly finds to be relevant and equitable.**

Husband's income is in addition to the massive wealth of assets. With the exchange of assets; regardless of how and when it occurs, both parties will live lavishly, regardless of whether spousal support is or is not required.

{¶ 232} After considering the above factors, the domestic relations court ordered Mahendra to pay Sangita spousal support in the sum of $10,000 per month.

{¶ 233} Mahendra does not refer to the statutory-factors finding made by the court or contend that any of these findings were erroneous. Instead, his argument is that Sangita does not "need" spousal support since she will be very wealthy merely through the division of marital property.

{¶ 234} Upon our review of the factors and findings, we find nothing in the trial court's decision indicating an abuse of discretion in granting spousal support. To the contrary, the factors weighed heavily in favor of granting Sangita spousal support. The evidence was clear that throughout the 33-year marriage, Sangita was never employed. Instead, she was responsible for running the household, including all the efforts involved in raising two children. Her work at home allowed Mahendra to focus on building the

companies and vast wealth that the parties accumulated during the marriage. The fact that Sangita may not "need" spousal support does not make the award inequitable. Given her efforts in keeping the household together while Mahendra spent much time away from the household building generational wealth, a spousal support award is entirely fair and reasonable.

{¶ 235} Mahendra cites several cases for the proposition that spousal support is not appropriate where a party leaves a marriage with "no debt, ample financial resources, and assets." Those cases are *Morrison v. Walters*, 2022-Ohio-1740, ¶ 8 (1st Dist.); *Jordan v. Jordan*, 2014-Ohio-1826, ¶ 65 (8th Dist.); *Stapleton v. Stapleton*, 2022-Ohio-3018 (1st Dist.); and *Fletcher v. Fletcher*, 1995 WL 386818 (2d Dist.).

{¶ 236} But all of these cases are distinguishable or irrelevant. The first three cases (*Morrison*, *Jordan*, and *Stepleton*) involved situations where a court refused to award spousal support to a party who the court found had demonstrated earning capabilities during the marriage. Sangita does not have demonstrated earning capacity, as described in the domestic relations court's findings discussed above. The fourth case (*Fletcher*) involved a challenge to the amount of a lump-sum spousal support award and we do not perceive its relevance.

{¶ 237} Considering her significant contributions to the marriage and all the factors discussed in the decision, we find nothing unreasonably, arbitrary, or unconscionable in the domestic relations court ordering Mahendra to pay $10,000 monthly spousal support payments to Sangita. We overrule Mahendra's second assignment of error.

### III. Conclusion

{¶ 238} Sangita has demonstrated error with regard to conversion rate language and we modify the decree as set forth above. Sangita has not demonstrated error in the

court's division of marital property, including the marital division of Vora Ventures, LLC. Sangita has not demonstrated error with regard to the court's decision to accept Mahendra's experts' opinions on the value of AnuPriya and the SGV Lot. And Sangita has not demonstrated error with regard to interest on the property division, and the date of division of certain assets.

{¶ 239} Mahendra has demonstrated one error concerning the court's division of the SGV shares. Otherwise, competent and credible evidence supports the court's conclusions finding that the Bank of Baroda account and AnuPriya are marital assets subject to equal division. Mahendra has not demonstrated error in the court's decision to award Sangita spousal support.

{¶ 240} Judgment affirmed in part, reversed in part, and remanded.


M. POWELL and SIEBERT, JJ., concur.

## **J U D G M E N T   E N T R Y**

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed in part as modified by replacing the current U.S. Dollar/Indian rupee conversion language in the final decree with the following language: "Future Payment Amount in INR equals US$ Obligation as of 12/31/2021 multiplied by the INR/US$ conversion rate on the Payment Date" and reversed in part as to the equal division of the SGV shares, and remanded for consideration of the effect of the SGV shares placement into the MV HUF and the equitable division of those shares, consistent with the above Opinion. In all other respects, the judgment of the trial court is affirmed.

It is further ordered that a mandate be sent to the Warren County Court of Common Pleas, Domestic Relations Division, for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed 50 percent to appellant/cross-appellee and 50 percent to appellee/cross-appellant.

*/s/ Matthew R. Byrne, Presiding Judge*

*/s/ Mike Powell, Judge*

*/s/ Melena S. Siebert, Judge*